FRANCIS D. FEIVOR AND MYRTLE FEIVOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feivor v. Commissioner
Docket No. 8992-93
United States Tax Court
T.C. Memo 1995-107; 1995 Tax Ct. Memo LEXIS 108; 69 T.C.M. (CCH) 2078; March 16, 1995, Filed *108 Decision will be entered under Rule 155. For petitioners: Gerald C. Condon, Jr. and Gary J. Fernandez For respondent: J. Paul Knap PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the year 1987 in the amount of $ 5,062 and for the year 1988 in the amount of $ 31,853. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the primary issue remaining for decision is whether petitioner Francis D. Feivor performed services for American Family Insurance Company as an employee or as an independent contractor. If we hold that he was an employee, we must decide whether he was subject to the alternative minimum tax in 1988. *109 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Francis D. Feivor (petitioner) and his wife, Myrtle Feivor, resided in Shawano, Wisconsin, at the time they filed their petition in this case. Petitioner and Myrtle Feivor hereinafter are referred to collectively as petitioners. Background
During the years at issue, petitioner performed services for American Family Insurance Company (American Family or the company) as a district manager. Petitioner began his career with Farmers Mutual Services (Farmers Mutual), the predecessor to American Family, in 1952 as an insurance agent in Reedsburg, Wisconsin. In 1954, one of the officers of Farmers Mutual recruited petitioner to become a district manager of a certain territory, District 6. At that time, petitioner was one of just a few successful full-time agents with Farmers Mutual, and the company wanted petitioner to recruit and develop other full-time exclusive agents. On November 1, 1954, petitioner entered into an agreement with Farmers Mutual. Petitioner agreed to pay the $ 4,907.56 lien then *110 encumbering District 6, and Farmers Mutual agreed to appoint petitioner as the district manager for District 6. Some 19 years later, on July 1, 1973, petitioner and the company executed a three-page District Manager's Agreement (the Agreement). During the years at issue, some 14 to 15 years later, that Agreement was the only document describing petitioner's relationship with American Family. Under that Agreement, petitioner agreed: (1) To recruit, train, supervise, and motivate agents in his district, subject to the direction of American Family; (2) to promote effectively the sale of all of the kinds of insurance and loans written by American Family; (3) to supervise generally the production and servicing of business; (4) to devote his full working time to the duties imposed upon him by American Family, to refrain from writing insurance for his personal account, and to represent no other insurance companies; (5) to make periodical activity and other reports as required from time to time; (6) to pay all expenses incurred by him in the performance of his duties, except as otherwise provided; (7) to keep accurate records of all business which shall be open to inspection by American *111 Family; (8) to furnish American Family with such information and records as may be necessary to enable American Family to account for and pay any required taxes; (9) to arrange for, schedule, conduct, participate in, and attend agents' meetings in his district and to participate in such other meetings as he may be required to attend by American Family; (10) to observe and abide by all of the rating schedules, manuals, rules, and regulations of American Family and to cooperate at all times with American Family; and (11) to participate in any group life and health insurance or retirement plan made available to managers by American Family. Under that Agreement, American Family, in turn, agreed: (1) To pay the manager pursuant to the provisions of the applicable compensation schedules in full payment for all services rendered; (2) to award prizes, allowances, and other benefits to the manager, subject to any rules, regulations, or conditions relating thereto; (3) to supply him with rating schedules, manuals, rules, and regulations in use by American Family; (4) to pay all compensation payable to the manager under the Agreement as soon as practicable; (5) to cooperate with the manager *112 in all matters germane to the Agreement and to consult, advise, and meet with him from time to time concerning the recruiting, selection, training, supervision, and motivation of agents; (6) to provide, at its discretion and expense, the assistance of a state director; (7) to furnish the manager with records relating to production, retention of business, agency growth, loss experience and profit, and other matters which in American Family's judgment would enable him to successfully meet the obligations imposed upon him by the Agreement. The Agreement further provided that the Agreement and the rights and interests of the district manager thereunder were not subject to sale or assignment. The Agreement could be terminated by either party by giving written notice to the other. [2] The Agreement automatically terminated upon the death of the district manager or upon the manager's 65th birthday. After termination, the district manager had to return to American Family all property belonging to the company and had to refrain from interfering with American Family agents or insurance policies within the district for 1 year. *113 During the years at issue, petitioner and his agents sold predominantly American Family insurance products. If American Family did not offer certain types of insurance, such as disability insurance, petitioner and his agents could service client needs through American Family Brokerage, Inc. (Brokerage). Brokerage was a wholly owned subsidiary of American Family and contracted with other insurance companies to provide the coverage and policies that American Family did not provide. Brokerage acted as an agent in obtaining policies from outside insurance companies, and American Family's insurance agents acted as subagents in providing these policies to their customers. American Family agents and district managers could not sell insurance policies other than American Family policies except through Brokerage. Petitioner's Role as District Manager
Petitioner's primary responsibility as a district manager was to recruit, train, and motivate people to become insurance agents and to work with them in developing successful agencies within his district. Each agency had just one insurance agent, sometimes referred to as a sales agent or a soliciting agent. Over his long career *114 with American Family, petitioner has also trained many agents to become district managers. All applicants for agent positions were personally interviewed by petitioner, who examined their qualifications and made the decision to recommend a hire, subject to American Family's final approval. Agents were recommended by petitioner, approved by the state director, and appointed by the regional vice president of American Family. However, petitioner in effect controlled the hiring and firing of agents within his district. [3] American Family ran the background checks (credit record, driving record, etc.) on applicants for an agent position. *115 Petitioner usually interviewed many applicants to get one suitable recruit. Much time was then spent training a new agent in managing an agency, in knowing the details of the various products offered by American Family, and in marketing these products. Petitioner received some assistance from underwriters and claims personnel, who were employees of American Family, in training insurance agents on American Family procedures. Petitioner worked with new agents on prospecting, making sales, handling claims, and handling any problems or complaints that ensued. Although American Family provided a 1-day seminar and a training manual for agents, petitioner determined the need for and conducted the bulk of his agents' training. American Family did not reimburse petitioner for his recruiting or training expenses. Petitioner fixed the terms and conditions of agents' services and maintained day-to-day contact with them. In 1987 and 1988, petitioner had 27 or 28 full-time American Family insurance agents in his district. There is no dispute that these agents were independent contractors. These agents worked strictly on commission and received Forms 1099 from American Family reporting *116 their income. They reported the amount of their sales directly to American Family as well as to petitioner. Petitioner held meetings once a month with all of his agents to discuss new products and to bring them up-to-date on company developments such as selling experiences and office procedures. Petitioner himself conducted these meetings or delegated certain presentations to some of his agents. In addition, at his own expense, petitioner published and distributed his own newsletter to his agents. American Family did not control the contents of the newsletter or reimburse petitioner for any of the costs associated with it. Petitioner and other district managers met once a month with their state director. During the years at issue, Gary D. Perkins (Perkins) was the state director for Wisconsin North. There were 12 sales operating districts within his territory, including petitioner's District 6. The purpose of these monthly meetings was for the managers to receive current information to pass along to their agents. Attendance at these meetings was recommended, and petitioner attended most of these meetings during 1987 and 1988 because he viewed the information exchanged at *117 these meetings as important to his business. There were no reprimands or other penalties for failure to attend such meetings. The state director acted as a conduit of information from American Family through the district managers to the sales agents. The state director's duties included maintaining the efficient operation of his or her particular sales operating territory, moving forward with production profit and growth, and implementing the directives of the company. In performing these duties, Perkins regularly sent letters to petitioner, addressing numerous issues. Perkins' letters included reminders about upcoming meetings, discussions of the merits of certain prospective agents, reviews of the performance of existing agents, and reminders to complete necessary paperwork and to prepare sales forecasts. Perkins informed petitioner when certain agents were not performing well and instructed petitioner that he should take the necessary actions to improve the situation. Petitioner generally also had an annual meeting with Perkins during which District 6's sales results for the year were examined and new sales forecasts for the next year were set. American Family did not set *118 sales quotas for petitioner to meet, and although petitioner set sales goals each year, petitioner did not set quotas for his agents. Petitioner also provided a calendar of events for his district. Perkins was aware of the sales of the agents from their reports to American Family and did not rely on petitioner for this information. The state director did not set working hours for district managers, nor did he or she verify work done. To provide incentives to agents to increase sales, American Family designed and paid for various companywide sales campaigns or promotions every year. In addition, each district manager had the discretion to create additional sales campaigns or promotions tailored to his agents, territory, and market. Petitioner developed his own sales promotions in which his agents could earn certain cash prizes or vacation trips. For example, in 1988, petitioner paid for cruises to the Bahamas for his top-performing agents. American Family did not control or attempt to dictate the nature or frequency of petitioner's sales promotions. American Family did not reimburse petitioner for his sales campaign expenses. Petitioner paid these awards from his own funds *119 and issued Forms 1099 to his agents for the amount of the awards or prizes. Petitioner claimed deductions for these amounts as advertising expenses on his Schedules C for the taxable years at issue. During such sales campaigns, petitioner provided weekly reports of production to Perkins and forwarded agents' reports so that Perkins would know how the promotion was performing in that district. Petitioner's Benefits and Burdens As District Manager
During the years at issue, American Family's state directors such as Perkins were salaried employees, each of whom had a furnished office provided and maintained by American Family. American Family also provided these state directors with clerical support, office equipment, and office supplies, as well as a company car and expense allowance. The company reimbursed the state directors for travel expenses and attendance at conventions and paid for vacation, holiday, and sick days. Petitioner did not receive any of the above benefits received by state directors. Petitioner was paid solely on the basis of override commissions, based upon a percentage of the business written by his agents. Petitioner was licensed to sell insurance *120 and was expected to maintain his license in effect. However, petitioner sold insurance policies directly to the public only through open agencies in his district. Petitioner was required to remit to American Family the sales commissions he received when he directly sold policies to the public. Again his compensation was limited to the override commission and not the agent's sales commission. Thus, petitioner generated his income through the training and development of successful agents. He did not receive a salary or payment for holidays or sick and vacation days. American Family had no vacation or holiday policy with respect to petitioner. Petitioner took vacations and closed his office for holidays at his own discretion. Further, petitioner was entitled to participate in only two of a number of retirement plans offered by American Family: a defined-benefit plan solely for district managers and a 401(k) defined-contribution plan. Petitioner contributed his own money to the 401(k) plan, and his contribution was not matched by American Family. American Family matched the contributions of participants in the 401(k) plan other than district managers. When the defined-benefit *121 plan was established, petitioner's compensation was reduced to fund the plan, and again there was no matching contribution by the company. American Family made matching contributions for participants other than district managers. Petitioner was not entitled to participate in American Family's profit-sharing plans. Thus, as part of his relationship with American Family, the only company benefits that petitioner received during the years at issue were participation (with his own monies) in two American Family retirement plans, the company's small contribution toward his health insurance plan, and coverage under errors and omissions malpractice insurance company policy in 1988. American Family provides errors and omissions policy coverage to all of its insurance agents and district managers because the State law of Wisconsin provides that the company will be liable for the acts and omissions of its agents whether they are employees or independent contractors. Petitioner purchased such a policy in 1987 from American Family but was not required to do so in 1988. [4]
*122 As a district manager, petitioner assumed primary responsibility for the financial success of his career. During the years at issue, he operated without any minimum compensation arrangement (earning income only through override commissions on new business and renewals sold by his agents) and personally bore the obligation to pay for his business expenses. Thus, petitioner bore the full risk for any business losses and received full benefit of any profits, all of which depended upon how he managed his business. Petitioner was obligated to provide his own office space and was obligated to operate the office with his own funds (e.g., payment of rent, utilities, and telephone). During the years at issue, petitioner owned the building in which he conducted his business. Petitioner paid approximately $ 50,000 when he purchased the building. Petitioner paid all expenses, including repairs, maintenance, taxes, insurance, and utilities, associated with this building. American Family did not provide petitioner with any office equipment or any reimbursement for expenses for the same. Except for a third computer, petitioner owned or leased from third parties all of the office equipment *123 used in his business. He owned two computers and $ 75,000 of other equipment. The third computer was owned by American Family, and petitioner made monthly payments to the company for its use. Petitioner paid for all office supplies for his business. Petitioner also had to purchase company letterhead and brochures from American Family. Further, petitioner determined the need for and paid for his own advertising, subject to preapproval by American Family for certain advertising bearing the American Family name and/or logo. American Family did not reimburse petitioner for his advertising expenses, with the exception of a $ 750 maximum reimbursement for certain approved advertisements. Petitioner expended funds for advertising substantially in excess of this reimbursement limit. Petitioner was required to pay for any clerical personnel working in his office. Petitioner employed employees of his own choosing, paid all of their wages, made withholdings of FICA and Social Security taxes with respect to those wages, and issued Forms W-2 to his employees. American Family was not responsible for the number or types of office support personnel petitioner hired or how much he paid them. *124 For example, petitioner's secretary was not an employee of American Family and was not covered by American Family retirement plans and other benefits available to company employees. [5] American Family did not reimburse petitioner for any of these personnel expenses. Petitioner undertook his own personal training (including certification as a Chartered Life Underwriter, a Chartered Financial Consultant, and a registered investment advisor) at his own initiative and expense. American Family did not reimburse petitioner for any of the expenses associated with this training. American Family did provide some training sessions, such as the veteran district managers' seminar, at its own initiative and expense. Petitioner owned his own automobile *125 and paid for all costs associated with it. Petitioner insured his insurance business and any open agencies at his own expense. American Family did not reimburse petitioner for any of these automobile or insurance expenses. Petitioner did not provide his district business records to American Family. American Family kept no official records relating to petitioner's business and did not require petitioner to keep records of whether he operated his business at a profit or loss. The 1973 District Manager's Agreement required petitioner to maintain a full-time work schedule and to attend training and development programs to learn about changes in the insurance industry and the features of new insurance products. However, petitioner was not responsible to American Family for keeping specific hours, and he did not provide time sheets or any other similar indications of how his days were spent. At all relevant times, petitioner predominantly used his own style and methods to sell insurance and to train agents. Petitioner could recommend termination of an agent, but such termination had to be approved by American Family. See supra note 3. If an agent quit or was terminated, petitioner *126 ran the "open agency" until another agent could be found to fill the position. [6] As a licensed insurance agent, petitioner himself sold policies and serviced clients through the open agency. Petitioner employed the employees of the open agency, paid all of their wages, made withholdings for FICA and Social Security taxes with respect to such wages, and issued Forms W-2 to such employees. Petitioner also paid all business costs of operating the open agency, including rent, utilities, and similar expenses. American Family bore no responsibility under the Agreement to reimburse petitioner in any amount for open agency business expenses and did not reimburse any of petitioner's expenditures for an open agency. Therefore, petitioner personally bore the burden of paying such business expenses during the years at issue as well as any previously incurred debts or outstanding accounts payable of the open agency. In earlier years, petitioner received sales commissions for policies he sold through the open agencies; however, during the years at issue, petitioner did not receive the sales commissions and received only the override commissions. *127 Petitioner's Sale of a Portion of His Business
On February 1, 1992, petitioner entered into a contract to sell approximately three-fourths of the agencies (21 agents) in his district to American Family. Petitioner and American Family negotiated as to the particular agents who would be transferred to a newly created district. American Family agreed to compensate petitioner in an amount equal to the income generated by those agencies during the 12 months preceding the date of transfer. Payment of this amount would take place over a 5-year period. Approximately 1 year prior to this contract, petitioner had proposed to American Family a similar transaction, but American Family had rejected the proposal at that time. Petitioner had the right to reject this contract before entering it, and/or negotiate the terms of the contract, but he was satisfied and accepted the company's offer. American Family did not, and did not have the right to, require petitioner to enter into the contract. Tax Treatment by American Family and Petitioner
The 1973 District Manager's Agreement is silent as to petitioner's status as an employee or independent contractor. On November 26, 1969, *128 American Family sent a letter (the 1969 company letter) to all district managers informing them that, as a result of an Internal Revenue Service audit of the company, the company must withhold income tax and Social Security tax payments from income earned under any compensation schedule of the Manager's Agreement since "the position of Manager is a full time job in our plan of operation". However, the letter concluded: "You can be certain these changes do not alter your independent contractor status as far as your relationship with [* * * American Family] is concerned. All the conditions of present Manager's Agreement will still apply. We will continue to use Manager's Agreements in the future." (Emphasis in original.) In later years, at the veteran district managers' seminars, Christopher S. Spencer (Spencer), associate general counsel of American Family, participated as an instructor and discussed "agent hiring and termination and other legal problems, maintaining the independent contractor status of our district managers, and other legal problems in managing agents". These seminars were held solely for district managers. During the 1987 taxable year, American Family sent *129 petitioner a Form W-2 reflecting wages paid to him in the amount of $ 201,441.70. Petitioner reported this amount as wages earned on his Federal income tax return for that taxable year and claimed a deduction on Schedule C for business expenses in the amount of $ 85,086. For the taxable year 1988, petitioner reported wages earned of $ 205,298.40 and claimed Schedule C deductions of $ 141,077. All of petitioner's business expenses (utilities, telephones, postage, office maintenance, payroll, computer leasing, business insurance, automobile, advertising, and miscellaneous business expenses) were legitimate business expenses and were reasonable in amount. Petitioner did not file a Schedule SE with his 1987 or 1988 tax return and did not pay any self-employment tax. Respondent does not challenge the amount of petitioner's claimed business expenses, but argues that such expenses are allowable only as Schedule A unreimbursed employee business expenses, deductible only as miscellaneous itemized deductions subject to reduction by 2 percent of adjusted gross income, [7] and not as Schedule C business expenses. Respondent also contends that petitioner is subject to the alternative minimum *130 tax in 1988. See supra note 7. OPINION Petitioner contends that he performed services for American Family during the years at issue as an independent contractor. Respondent argues that petitioner performed services for American Family during the years at issue as an employee. Petitioner bears the burden of proving that the nature of his professional relationship with American Family was not that of an employer-employee. *131 Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Based on the record in this case, we conclude that petitioner has met his burden of proof, and we hold that petitioner rendered services as an independent contractor. Whether an individual is an employee or an independent contractor is determined after examining all relevant facts and circumstances and applying common law principles. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 118,    , 112 S. Ct. 1344, 1348 (1992); Matthews v. Commissioner, 92 T.C. 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Section 3121(d) provides a definition of "employee" for purposes of the Federal Insurance Contributions Act. It includes any officer of a corporation and "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". Section 31.3401(c)-1, *132 Employment Tax Regs., provides guidelines for the determination of employer-employee status: (b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the *133 means and methods for accomplishing the result, he is not an employee.
The regulations under section 3121 contain nearly identical provisions. Sec. 31.3121(d)-1, Employment Tax Regs.
Both parties also cite Rev. Rul. 87-41, 1987-1 C.B. 296. That ruling lists 20 factors to consider in determining whether a common law employer-employee relationship exists: (1) Instructions of when, where, and how to work; (2) training; (3) integration of the worker's services into the business; (4) whether the services were rendered personally or through agents; (5) whether the worker hires, supervises, and pays assistants; (6) whether the relationship was continuous or periodic; (7) who sets the hours of work; (8) whether the worker must devote substantially full time to the work; (9) whether the work is performed on the premises of the person for whom the services are performed; (10) who determines the order or sequence of work; (11) whether the worker is required to submit oral or written reports; (12) whether payment is by the hour, week, or month; (13) who pays the business and/or traveling expenses; (14) who furnishes the tools and materials; (15) *134 whether the worker has a significant investment in the business; (16) whether the worker has the possibility of realizing a profit or loss; (17) whether the person works for more than one organization at a time; (18) whether the worker makes his services available to the general public; (19) whether the principal has the right to discharge the worker; and (20) whether the worker has the right to terminate. Among the relevant factors to which courts have looked in determining the substance of an employment relationship are the following: (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether or not the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating. United States v. Silk, 331 U.S. 704, 716 (1947); Simpson v. Commissioner, 64 T.C. 974, 984-985 (1975); Sec. 31.3121(d)-1(c)(2), Employment Tax Regs. *135 Whether an individual will be classified as an employee or as an independent contractor requires an examination of all of the facts and circumstances of the case, and no one factor is controlling. Simpson v. Commissioner, supra at 985; Sec. 31.3401(c)-1(d), Employment Tax Regs.
Although no one factor is dispositive of the employer-employee issue, we use the "right to control" test to determine the nature of a professional working relationship. Matthews v. Commissioner, 92 T.C. at 361. Under this test, an employer-employee relationship exists when an alleged employer retains the "right to control" the manner and means by which an alleged employee performs his services. Nationwide Mut. Ins. Co. v. Darden, supra; Simpson v. Commissioner, supra at 984-985; Ellison v. Commissioner, 55 T.C. 142, 152-153 (1970). It is the right to control that is critical: we must examine not only the control actually asserted over the details of an alleged employee's performance but also the degree to which an alleged *136 employer may intervene to impose such control. Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943); deTorres v. Commissioner, T.C. Memo. 1993-161. Respondent argues that the record in this case shows that, during the years at issue, American Family exercised control or had the right to exercise control over petitioner's professional behavior to such a degree that we must conclude he worked for American Family as an employee. In support of that position, respondent emphasizes certain provisions of petitioner's 1973 District Manager's Agreement with American Family: (1) Petitioner must "recruit, train, supervise and motivate agents in his district, subject to the direction of * * * [American Family]"; (2) petitioner must "supervise generally the production and servicing of business" and must "devote his full working time to the duties imposed upon him"; (3) petitioner must "refrain from the writing of insurance for his personal account" and can work for no insurance company other than American Family; (4) petitioner must "make such periodical activity and other reports as may be required from *137 time to time"; (5) petitioner must "keep accurate records of all business relating to this agreement which shall be open to proper inspection of * * * [American Family] at all reasonable times"; (6) petitioner must "attend agent's meetings in his district and * * * participate in such other meetings as he may be required to attend by * * * [American Family]"; (7) petitioner must work full time; (8) petitioner was "not authorized to appoint any agent, sub-agent, solicitor, or broker for or on behalf of * * * [American Family]"; (9) neither the Agreement nor the rights and interests under it were subject to sale or assignment; (10) the Agreement could be terminated by either petitioner or American Family by giving written notice to the other; (11) American Family retained the right to change the compensation schedule at any time without the consent of petitioner; and (12) petitioner was bound to obey the regulations and provisions contained in the district manager's manual. Respondent thus concludes that the Agreement establishes a right to control petitioner. However, based on the record in this case and settled legal principles, we conclude that respondent's emphasis on these Agreement *138 provisions is misplaced. In fact, we have previously addressed whether the types of restrictions respondent points to in this case bear on an insurance company's control of an insurance agent's professional behavior, and we have squarely concluded that they have little or no bearing on such inquiry. Simpson v. Commissioner, 64 T.C. at 986-987. Although petitioner is not an insurance agent per se, the same type of analysis would apply to his position as well. Petitioner's position is more closely akin to that of an independent general insurance agent than to the employee position of state director. Respondent does highlight facts in the record that bear on our examination of the control test, but we find these facts insufficient to alter our view that American Family did not control or have the right to control the manner in which petitioner pursued his career as a district manager during the years at issue. Particularly, we are not persuaded by respondent's argument that certain letters sent by Perkins to petitioner during the years at issue illustrate the degree of control typically exerted by an employer over an employee and exerted by American *139 Family over petitioner in their actual working relationship. Respondent contends that the letters demonstrate that American Family through its state director controlled not only petitioner's goals but also the manner in which he had to achieve those results. We disagree. These letters cover areas from the general to the trivial. In his letters addressed to petitioner, Perkins would reiterate general American Family guidelines as well as provide specific instructions to handling certain problems. However, the record indicates that petitioner had the discretion to handle the problem according to Perkins' suggestions or, in effect, to ignore the letters and devise his own solutions. It is apparent that petitioner's success was measured by the results achieved, not by the specific manner in which they were achieved. As a result, we conclude that American Family did not control petitioner within the meaning intended in the employer-employee context. Respondent focuses on the fact that petitioner could not sell insurance products other than through American Family or Brokerage. The restriction on petitioner's ability to place insurance with other insurance companies did not serve *140 to control the means and details by which he conducted his business activities. This restriction admittedly restricted petitioner's freedom to pick and choose, from competing insurance policies, those policies that best suited the interests of his clients; however, it did not serve to control petitioner with regard to the means or details by which he sold American Family insurance policies. Simpson v. Commissioner, 64 T.C. at 987. [8]
*141 Respondent also points to the fact that, during the years at issue, petitioner was required to maintain regular business hours as a district manager and to attend training and development programs as indicative of American Family's control over petitioner. First, based on the record in this case, we find that American Family's requirement that district managers maintain regular office hours was a broad notion reflecting American Family's concerns in providing a high standard of customer service and, in practice and effect, was not a mandate that petitioner spend certain specific hours in his office. Rather, the record clearly shows that, during the years at issue, petitioner set the specific hours of his office's operation to coincide with his personal and professional goals, using his own business judgment without any direction from American Family management. Second, it is also clear that, while petitioner was required to attend training and development programs, these programs were designed to inform district managers as to the nature and operation of new insurance products and were not part of a pattern or practice used by American Family to dictate how district managers were *142 required to operate their districts. In contrast, the record reveals that petitioner was promoted to district manager because his attitudes and methods of selling insurance were quite successful, and continuation of that success was left to his professional discretion. Similarly, we do not consider American Family's right under the Agreement to approve agents selected by petitioner as a material restriction on petitioner's freedom to operate as a district manager pursuant to his own business judgment. This requirement did not preclude petitioner from hiring the agents he selected or from maintaining autonomy over any retained agents. In fact, the record indicates that the underlying purpose of the approval requirement was to ensure that qualified people would be handling American Family's products and properly serving the public so as to minimize and avoid errors and omissions liability. In summary, based on the record in this case, we conclude that American Family in practice showed no pattern of supervision and control over the manner in which petitioner performed in his business, and further, that American Family did not have the right to control petitioner's professional *143 services during the years at issue. In reaching this conclusion we have been mindful, as respondent correctly indicates in her brief, that the degree of control necessary to establish an employer-employee relationship varies with the nature of the work and is generally lower when applied to professional services than when applied to nonprofessional services. Reece v. Commissioner, T.C. Memo. 1992-335; Herman v. Commissioner, T.C. Memo. 1986-590. From our examination of the record in this case, it appears that the Agreement's provision that a district manager may receive the "assistance" of a state director in performing his functions did not rise to the level of control or supervision that respondent suggests. We conclude from the record as a whole that, during the years at issue, petitioner was performing services for American Family as an independent contractor. In reaching this conclusion, we are particularly persuaded by: (1) The high degree of control petitioner exercised over the manner in which he operated his business; (2) the fact that petitioner personally incurred his business expenses; and (3) the fact that *144 petitioner bore the burden and risk of loss from his business as a district manager. In short, the record reveals that, in the day-to-day operation of his business, petitioner conducted his activities free from any substantial control by American Family. Of course, control is not the only factor we consider when determining the nature of a professional working relationship. In this case, the record contains evidence as to various other factors relevant to our inquiry, some of which are more traditionally associated with an employee-employer relationship, and others of which are more traditionally related to a worker's status as an independent contractor. We recognize that certain indicia of an employer-employee relationship do exist in the present case. The parties intended their relationship to be a permanent one, and petitioner's work was clearly part of American Family's regular business. However, from an examination of the entire record and after weighing all of the relevant factors, we must conclude that, during 1987 and 1988, petitioner was not American Family's employee. We are not persuaded to conclude otherwise by respondent's emphasis on the fact that petitioner reported *145 his American Family income as wages on his 1987 and 1988 returns. It is well settled that, in determining the nature of a professional relationship, our focus is on the actual relationship existing between the contracting parties and the application of the common law factors to the facts and circumstances of the particular case. Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 233. Accordingly, we do not draw the inference, as respondent suggests we should, based on American Family's issuance of a Form W-2 to petitioner, that it overall treated petitioner as an employee. The record shows that, although petitioner reported his American Family income as wages, he deducted his business expenses on Schedule C, directly from gross income (as would an independent contractor), rather than as miscellaneous itemized business deductions (as would an employee deducting unreimbursed employee business expenses). An individual's investment in his work facilities is clearly associated with status as an independent contractor, as is the possibility that he may sustain a loss from the operation of his business, and the fact that he retained personnel *146 under his control. Simpson v. Commissioner, 64 T.C. at 988. In this case, petitioner clearly was responsible for investing in the facilities he used to perform as a district manager during the years at issue, certainly bore the risk of sustaining a monetary loss in that business, and also retained personnel whose terms and conditions of employment he fixed unilaterally. Petitioner's sole compensation during the years at issue was in the form of override commissions, and he fully bore the risk of turning a profit or loss based upon his skill as a district manager and insurance salesman, and his business acumen. In conclusion, we hold that, during the years at issue, petitioner was performing services for American Family as an independent contractor and must report his business income and expenses on Schedule C. Having so concluded, we need not address the alternative minimum tax issue. See supra note 7. To reflect the concessions and the above holding, Decision will be entered under Rule 155. Footnotes
1. Petitioners have conceded certain items in the notice of deficiency: (1) The disallowance of claimed net losses from horse breeding on Schedule C for the taxable year 1988; (2) the allowance of a limited portion of claimed net losses from horse breeding on Schedule E, in accordance with the passive loss limitation rules, for the taxable year 1988; (3) the disallowance of a portion of claimed deductions for farm depreciation expense on Schedules F for the taxable years 1987 and 1988; and (4) the increase of capital gains for the taxable year 1988.↩
2. American Family had the right to terminate petitioner or any other district manager from his or her position; however, such a decision would be based upon a severe problem in the district, such as the district manager's continually not following the directives of the state director or of American Family in general.↩
3. Over the years, American Family indicated on a few occasions to petitioner that certain agents should be terminated, but petitioner did not terminate those agents. In one instance American Family required petitioner to hire an agent over petitioner's objections. Petitioner yielded to the appointment of that agent rather than create tensions and ill will between himself and his state director. Nevertheless, petitioner could have blocked the hiring of that agent had he chosen to do so.↩
4. Christopher S. Spencer, associate general counsel of American Family, opined at trial that, since district managers are considered employees of the company, they are covered for such risks by the company just as any other employee is. Spencer seemed unaware that the issue before this Court is whether petitioner is an employee or an independent contractor. Moreover, Spencer seemed to ignore the effect of local State law that draws no distinction between employees and independent contractors for those risks.↩
5. In contrast, Perkins' secretary was an employee of American Family and was covered by American Family's pension, workers' compensation, and health plans. Similarly, the associate general counsel's secretary was an employee of American Family and received such employee benefits.↩
6. It is not clear in the record whether petitioner had the discretion to leave an agency open and sell the agency's policies through other agents or agencies in his district. Petitioner thought that he could have walked away from an open agency, but he did not walk away from these open agencies out of a feeling of moral and professional obligation. His motivation to fill the open agencies stemmed from prudent business practice, since his compensation was based upon sales by his agents, and he lost time and money bearing the costs of the open agencies.↩
7. The amount of the business expense deduction allowed by respondent, before the 2 percent reduction, was $ 66,942 for the taxable year 1987 and $ 125,772 for 1988. After the 2 percent reduction, the miscellaneous itemized deductions amounted to $ 62,621 for 1987 and $ 121,629 for 1988. The 1988 calculation involved the alternative minimum tax. However, in computing the alternative minimum tax, all miscellaneous itemized deductions are disregarded, so all of petitioner's business expenses were in effect disallowed for 1988 resulting in an effective tax rate for that year of some 80 percent.↩
8. In two cases dealing with insurance agents, similar restrictions placed on the agents did not prevent the finding that such agents were independent contractors. See Reserve Natl. Ins. Co. v. United States, 34 AFTR 2d 74-5104, 74-1 USTC par. 9486 (W.D. Okla. 1974); Standard Life & Accident Ins. Co. v. United States, 35 AFTR 2d 75-1150, 75-1 USTC par. 9352 (W.D. Okla. 1975) (a "general agent", who recruited and motivated soliciting agents, was paid only through commissions, and bore his own business expenses, was found to be an independent contractor). See also Smithwick v. Commissioner, T.C. Memo. 1993-582, and Butts v. Commissioner, T.C. Memo. 1993-478↩, in which so-called Neighborhood Office Agents of Allstate were found to be independent contractors.