T.C. Memo. 2002-22

UNITED STATES TAX COURT

MONTY BISCEGLIA AND PATRICIA BISCEGLIA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11328-99.          Filed January 22, 2002.

<u>Charles M. Torres</u>, for petitioners.

<u>Rebecca Dance Harris</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined the following
deficiencies and penalties with respect to petitioners' Federal
income taxes:[1]

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

| Year | Deficiency | Penalties[1] sec. 6663(a) |
|------|-----------|---------------------------|
| 1993 | $40,980 | $29,677 |
| 1994 | 452 | -- |
| 1995 | 46,543 | 34,824 |

[1] The notice of deficiency states that in the event it is held that all or part of the underpayment in tax required to be shown on the 1993 and 1995 returns is not due to fraud, the sec. 6662(a) accuracy-related penalty applies.

In his Answer to Amended Petition, respondent asserts that, pursuant to section 6214(a), the proposed deficiency for 1993 should be increased to $42,836 and the penalty for that year should be increased to $32,127. Respondent also concedes that the deficiencies for 1995 should be reduced to $45,784 and that the penalties for that year should be reduced to $34,338. On brief, respondent concedes that petitioner Patricia Bisceglia (Patricia), who filed joint Federal income tax returns with her husband for the years in issue, is not liable for the section 6663(a) fraud penalty for taxable years 1993 and 1995 but contends that she is liable for section 6662(a) accuracy-related penalties for those years.

After concessions, the issues for decision are: (1) Whether petitioners realized net income for taxable years 1993 and 1995 in excess of amounts reported on their returns; (2) whether petitioner Monty Bisceglia (petitioner) is liable for the fraud penalty under section 6663 for taxable years 1993 and 1995; and (3) whether (in the alternative to the fraud penalty for

petitioner) petitioners are liable for section 6662(a) accuracy-related penalties for taxable years 1993 and 1995.[2]

## FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference. When petitioners filed their petition, they resided in Kingsport, Tennessee.

During 1992 and 1993, petitioner was a deputy sheriff in the Sullivan County, Tennessee Sheriff's Department. Petitioner was also in business with his father, James E. Bisceglia (Jack), who controlled the finances of their business activities. Petitioner had no role in maintaining the business records. Petitioner did not finish high school, although he subsequently acquired a graduate equivalent diploma. Jack completed high school and attended college for 3 weeks. Patricia did not work outside the home.

---

[2] The 1994 deficiency results from respondent's determination that petitioners' taxable income for 1994 should be increased by $3,000, owing to an improper carryover from 1993 of long-term capital losses previously deducted. Petitioners presented no evidence with regard to this issue and have not addressed the issue on brief. We treat petitioners' failure to argue as, in effect, a concession of this issue. See Rule 151(e)(4) and (5); Sundstrand Corp. & Subs., Inc. v. Commissioner, 96 T.C. 226, 344 (1991). As discussed below, however, respondent's net worth analysis also indicates that petitioners had a 1994 net loss (without considering the $3,000 adjustment), which would appear to be available to offset the $3,000 increase in taxable income. The parties have not addressed this computational matter, which we expect to be taken into consideration in the Rule 155 computations.

In June 1992, petitioner and Patricia obtained a $135,000 mortgage loan from the Home Federal Bank (Home Federal), in Kingsport, Tennessee. The mortgage was secured by their residence at 1037 Parham Place, Kingsport, Tennessee. Late in 1992 or early in 1993, petitioner and Patricia borrowed approximately $55,000 from NationsBank.

In December 1992, petitioner purchased the sole ownership interest in Murphy's Auto Sales (Murphy's) for $10,000. Petitioner and Jack operated Murphy's throughout 1993, 1994, and 1995 at its location on 330 Lynn Garden, in Kingsport. Murphy's was a "buy here, pay here" operation. Its clientele consisted principally of customers who could not obtain financing for their automobile purchases elsewhere. Typically, a Murphy's customer would sign a sales agreement which indicated the sales price and any unpaid balance, net of any trade-in and cash deposit. The sales agreement also indicated an amount which exceeded the unpaid balance, identified as a "time differential amount which is amount owing if not paid by cash." This "time differential amount" represented the total of the unpaid purchase price balance and the finance charges that would be paid over the scheduled term of the payments. Each month, Jack recorded the car sales on manila envelopes. The sales income recorded included the time differential amount. Once a customer paid off his account, the records of that account were destroyed.

During 1992 and 1993, petitioner and Jack operated a body shop on property located at Netherland Inn Road in Kingsport, Tennessee. The body shop purchased wrecked autos which it would repair and resell through Murphy's.

During the years in issue, petitioner and Jack also built and sold condominiums.

On May 3, 1995, petitioner signed and gave a "Personal Financial Statement" to NationsBank representing as "true and complete" that he had a salary of $144,000 and a net worth of $1,321,650.

Petitioners' returns were prepared by an old school friend of Jack's who was an accountant in Florida. To prepare the tax returns, the accountant used information from a one-page summary that Jack supplied.

On their 1993, 1994, and 1995 returns, petitioners reported adjusted gross income (loss) of ($11,652), $16,270, and $18,635, respectively. Petitioners' returns indicate that Murphy's was on a cash basis for 1993 and 1994 but on an accrual basis for 1995.

Respondent's examination of petitioners' 1993, 1994, and 1995 returns began in May 1996. Following an initial examination of petitioners' books, respondent's agent reconstructed petitioners' income using the net worth method. To that end, respondent's agent identified petitioners' assets, liabilities, and expenses. Respondent's agent then reconstructed petitioners'

income by comparing changes in their net worth from 1 year to the next for the 3 years in issue. Respondent's net worth analysis is as follows:[3]

### Net Worth Expenditures Computation

| Assets | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Cash on hand | $2,500 | $2,500 | $2,500 | $2,500 |
| Cash in banks | 220 | 2,639 | 7,277 | 21,877 |
| Notes receivable | – | 115,000 | 111,359 | 107,357 |
| Inventory | 20,477 | 18,514 | 12,000 | 18,221 |
| Investments | 821,000 | 654,000 | 889,621 | 762,000 |
| Net accounts receivable | 9,000 | 171,000 | 105,200 | 99,000 |
| Total assets | 853,197 | 963,653 | 1,127,957 | 1,010,955 |
| **Liabilities & Accum Depr** | | | | |
| Notes & loans payable | $409,938 | $406,899 | $653,369 | $402,947 |
| Accumulated depreciation | -- | – | 1,873 | 3,746 |
| Total liabilities & Accum depr | 409,938 | 406,899 | 655,242 | 406,693 |
| Net worth | 443,259 | 556,754 | 472,715 | 604,262 |
| Less beginning net worth | | 443,259 | 556,754 | 472,715 |
| Increase in net worth | | 113,495 | (84,039) | 131,547 |
| Add: Personal expenses | | 29,148 | 58,972 | 26,628 |
| Adjustments (capital loss not deducted) | | (1,800) | -- | – |
| Corrected adjusted gross income | | 140,843 | (25,067) | 158,175 |
| Adjusted gross income reported | | (11,652) | 16,270 | 18,635 |
| Unreported income | | 152,495 | [1]41,337 | 139,540 |

[1] It appears that $41,337 should be a negative figure, rather than positive unreported income as indicated on respondent's net worth analysis. Consistent with this conclusion, respondent has determined no 1994 deficiency arising from any unreported income indicated by the net worth analysis. Petitioners have not raised, and we do not reach, any issue as to whether any part of any 1994 net loss should be deductible in 1993 or 1995 as a net operating loss carryback or carryover. See sec. 172.

The following table, as set forth in respondent's Answer to Amended Petition, shows the particular assets and

---

[3] This table, as set forth in respondent's Answer to Amended Petition, reflects certain adjustments to the net worth analysis upon which the notice of deficiency was predicated, as discussed in more detail, infra.

liabilities that were used in computing petitioners' asserted
unreported income.

### Cash in Bank

| Institution | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Nations Bank 5140020-576-9 | $220 | $2,639 | $7,277 | $21,877 |
| Total | 220 | 2,639 | 7,277 | 21,877 |

### Notes Receivable

| Description | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Blake Carter | – | $115,000 | $111,359 | $107,357 |
| Total | -- | 115,000 | 111,359 | 107,357 |

### Investments

| Property | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| 1008 Page Place | $140,000 | $140,000 | – | -- |
| 1148 Independence | 58,000 | -- | -- | -- |
| 2002 Netherland Inn Road | 109,000 | -- | -- | -- |
| Porsche | – | -- | $4,954 | -- |
| 330 Lynn Garden | 59,000 | 59,000 | 59,000 | 59,000 |
| 1011 Parham Place | 265,000 | 265,000 | 265,000 | 265,000 |
| 1037 Parham Place | 160,000 | 160,000 | 160,000 | 160,000 |
| Lot 29 Rotherwood | 20,000 | 20,000 | 20,000 | [1] 410,000 |
| 2 Acres Rotherwood | 10,000 | 10,000 | 10,000 | 10,000 |
| Condo's | -- | -- | 310,667 | 248,000 |
| Total | 821,000 | 654,000 | [2] 889,621 | 762,000 |

[1] On the basis of the parties' stipulations, it appears that this figure should be $20,000, which is consistent with the $762,000 total indicated for Dec. 31, 1995.

[2] The sum should be $829,621. The discrepancy is not explained in the record. Because respondent determined a decrease in petitioners' net worth for 1994, the apparent error does not operate to petitioners' detriment.

## OPINION

### I.  Unreported Income

#### A.  The Net Worth Method

Respondent determined deficiencies in petitioners' 1993 and
1995 income taxes by using the net worth method to reconstruct
their income.  Petitioners bear the burden of overcoming the

presumptive correctness of respondent's determination.  Rule

142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Conti v.

Commissioner, 39 F.3d 658, 663 (6th Cir. 1994), affg. and

remanding T.C. Memo. 1992-616; United States v. Walton, 909 F.2d

915, 918 (6th Cir. 1990).[4]  On the other hand, respondent has the

burden with respect to the $1,856 increase in the 1993 deficiency

as sought in his Answer to Amended Petition.  Rule 142(a).

Because petitioners have not contested the items giving rise to

the asserted increase in deficiency, we conclude and hold that

respondent has met his burden of proof as to those items.[5]

---

[4] In certain circumstances, if a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax, sec. 7491 places the burden of proof on the Commissioner.  See sec. 7491(a)(1); Rule 142(a)(2).  Sec. 7491 is effective with respect to court proceedings arising from examinations commenced after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(2), 112 Stat. 685, 726. The parties have stipulated that respondent's examination began in May 1996.  Accordingly, sec. 7491 is inapplicable.

[5] The asserted increase in the 1993 deficiency arises from two adjustments respondent made after issuing the notice of deficiency.  The first adjustment corrects the amount of cash in banks utilized in petitioners' 1993 opening net worth.  The other adjustment corrects the amount of the adjustment for capital losses not deducted in that year (with correlative adjustments being made for 1994 and 1995).  Petitioners have stipulated the corrected figures for cash in banks, and petitioners' tax returns, admitted as exhibits herein, show that the correction to the capital loss amount is appropriate.  Petitioners do not contest these corrections.

Respondent's Answer to Amended Petition also identifies two other adjustments to the net worth computation that were made
(continued...)

It is well settled that the Commissioner may use the net worth method to reconstruct income, if only as a means of testing the accuracy and trustworthiness of the taxpayer's books and records.  See <u>Holland v. United States</u>, 348 U.S. 121, 131 (1954); <u>Conti v. Commissioner</u>, <u>supra</u>; <u>Foster v. Commissioner</u>, 487 F.2d 902, 903 (6th Cir. 1973), affg. T.C. Memo. 1972-188; <u>Gleis v. Commissioner</u>, 24 T.C. 941, 949 (1955), affd. 245 F.2d 237 (6th Cir. 1957); <u>Hurley v. Commissioner</u>, 22 T.C. 1256, 1261 (1954), affd. 233 F.2d 177 (6th Cir. 1956).

Petitioners contend that respondent was not entitled to use the net worth method to reconstruct their income, because respondent's examining agent failed to review their business records for 1994 and 1995.  Citing <u>Holland v. United States</u>, <u>supra</u> at 132, petitioners argue that the failure of respondent's agent to review and examine these records makes the net worth analysis "arbitrary and without merit."  We disagree.

Respondent's examining agent testified that she initially reviewed petitioners' 1993 records and found that the information therein was fairly consistent with net income reported on

---

[5](...continued)
after the issuance of the notice of deficiency:  (1) A reduction of notes receivable for the period ending Dec. 31, 1995; and (2) a reduction of petitioners' personal living expenses for each year in issue.  The effect of these two adjustments is to decrease petitioners' indicated taxable incomes and thus the deficiencies determined by respondent.

petitioners' tax returns.  Respondent's agent determined, however, based on a review that ultimately entailed use of a net worth analysis, that petitioners had understated their 1993 net income by overstating cost of goods sold.  Having determined that the 1993 records were untrustworthy, respondent's agent concluded that there was no point in going through petitioners' 1994 and 1995 records, because they were the same as the 1993 records.  Rather, the examining agent reconstructed petitioners' 1994 and 1995 income using the net worth analysis.

Petitioners placed their financial records into evidence in an incomprehensible state.  The records consist, in the main, of some 28 manila envelopes bearing handwritten notations on the outside and stuffed with invoices, computer printouts, and such.  The records include a large and unsorted wad of receipts (introduced as a single exhibit) and an undifferentiated stack of more than 80 file folders (also introduced as a single exhibit) putatively documenting bad debts and repossessions of used cars.  There appears to be no general ledger.  After attempting, unsuccessfully, to relate petitioners' exhibits to the amounts shown on their tax returns for the years in issue, we appreciate the task faced by respondent's agent in examining these records.  Even if we were to assume--consistent with the conclusion of respondent's agent with respect to the 1993 taxable year--that petitioners' books and records are more or less consistent with

the figures reported on their tax returns (a matter that we have been unable independently to verify), such a circumstance would not establish the accuracy of the business records or foreclose respondent from using the net worth method to test their trustworthiness.  See Holland v. United States, supra at 132 (even if no false entries are detected, the taxpayer's books may be "more consistent than truthful"); Foster v. Commissioner, supra at 903.

Petitioners rely on Talley v. Commissioner, 20 T.C. 715 (1953), for the proposition that, before utilizing the net worth method, respondent must demonstrate that a taxpayer's books and records do not accurately reflect the taxpayer's income. Petitioners' reliance on Talley is misplaced.  Talley predates Holland v. United States, supra, which rejected such a rule.  See Shelhorse v. Commissioner, T.C. Memo. 1980-98.

B.  Petitioners' Alleged "Leads" as to Nontaxable Sources

Petitioners contend that under Holland and its progeny, respondent was required, in using the net worth method, to exhaust all leads negating possible sources of nontaxable income. Petitioners contend that they furnished respondent certain leads that respondent failed to pursue, thus rendering his determinations arbitrary.

In some cases, such as fraud and criminal cases, the Commissioner may be expected to investigate leads of nontaxable

sources of income that are reasonably susceptible of being checked. We have held, however, that the Commissioner is not required to investigate leads where the taxpayer bears the burden of proof. See Tunnell v. Commissioner, 74 T.C. 44, 57-58 (1980), affd. 663 F.2d 527 (5th Cir. 1981). As previously discussed, petitioners bear the burden of proving that the amounts of deficiencies determined by respondent were incorrect.

Even if we were to assume that the lead-check rule were applicable here in determining the validity of respondent's use of the net worth method for purposes of determining petitioners' deficiencies, the existence of likely sources of taxable income--namely, petitioners' automotive and construction-related businesses--would temper the need for respondent to pursue leads as to other potential nontaxable sources of income. See King v. Commissioner, T.C. Memo. 1978-351. In any event, as described below, the quality of the "leads" that petitioners allegedly offered respondent is insufficient to convince us that respondent's use of the net worth method was arbitrary or invalid, or that respondent erroneously determined that petitioners' unreported income was from taxable sources.

1. The 1994 and 1995 Records "Lead"

On brief, petitioners contend that respondent improperly failed to investigate the "lead" represented by their 1994 and 1995 business records. This contention is in essence a

restatement of petitioners' argument, previously considered and rejected, that respondent was required to examine their 1994 and 1995 records before using the net worth method to reconstruct their income. Petitioners do not identify exactly what items in their 1994 and 1995 books and records might constitute a lead as to potential nontaxable sources of income, and we have discovered none.

2. The Private Expenditures "Lead"

On brief, petitioners contend that "the Government also failed to make any investigation as to whether Petitioners 1994 and 1995 private expenditures exceeded available declared resources." It is not apparent how this contention is relevant to establishing any potential nontaxable sources of income or otherwise refuting the results of respondent's net worth analysis. Petitioners do not argue, for instance, that the amounts of personal living expenses reflected in the net worth analysis are incorrect. Rather, petitioners' contention seems directed more toward questioning respondent's reasons for undertaking a net worth analysis. Even if we were to assume, for sake of argument, that petitioners' "private expenditures" (by which we understand petitioners to mean personal living expenses) did not exceed their "available declared resources" (by which we understand petitioners to mean the amounts of income they reported on their tax returns), this circumstance would not tend

to show error in respondent's determination that unexplained increases in petitioners' net worth are attributable to unreported taxable income. That is to say, respondent's net worth analysis is wholly compatible with (and partly predicated on) an assumption that petitioners might have realized more income than they consumed through "private expenditures."

### 3. The Cash Hoard "Lead"

Finally, petitioners contend that respondent failed to make a reasonable investigation of the "lead" that their 1993 beginning net worth, as reflected in respondent's net worth analysis, incorrectly omitted $125,000 in cash, which petitioners allege they had in Jack's safe as of January 1, 1993. There is no evidence as to when petitioners may have provided respondent this "lead", which is predicated almost entirely on petitioner's and Jack's testimony at trial. Hence, there is no basis to conclude that respondent would have had reason to investigate such a "lead" in the course of his examination.

In any event, petitioners have failed to show that the cash hoard existed after 1992, or that, if it did exist, it was a source of nontaxable income during the years in issue. On direct examination, Jack testified that after petitioners obtained the $135,000 Home Federal mortgage loan in June 1992, Monty signed the check over to him, and that he (Jack) then cashed the check, although he could not recall where he cashed it. Inconsistently,

Jack testified on cross-examination that petitioner "cashed the check and gave it to me."  Jack testified that he could not recall what type of bills he received, although he "usually" got $100 bills.  He testified that he put the $135,000 cash in a safe in his house and that to the best of his knowledge, $10,000 of this cash was "used up" when petitioner purchased Murphy's at the end of 1992.  Jack testified that he had been keeping cash in his safe for 40 years and that he always paid cash for everything.

Petitioner's testimony about these events was vague and inconsistent.  He initially testified that he did not recall the amount of the check but in response to leading questions testified that it was in the "range" of $130,000 to $135,000.  He initially testified that he was uncertain whether he had cashed the check or not, but then testified that he knew that he had signed the check and given it to Jack.  On cross-examination, he testified that "I suppose" that Jack cashed the check. Petitioner testified that he did not remember whether he was present when Jack cashed the check or whether he went with Jack to put the money in Jack's safe.  He testified that as far as he knew, the money was still in Jack's safe as of the time of the trial.[6]

---

[6] On cross-examination, petitioner testified as follows:

Q.  * * * you're testifying that in December of '93--
                                      (continued...)

Consistent with this testimony, petitioners' arguments on brief seem premised on an assumption that a $125,000 cash hoard remained in Jack's safe throughout the years in issue.  If the premise is valid, then the existence of a cash hoard is immaterial:  Respondent's omission of such a cash hoard from petitioners' opening and closing net worth for each year in issue would have no effect on the amount of unreported income determined for each year and hence would not disturb the presumption of the validity of respondent's determination.  See Harp v. Commissioner, 263 F.2d 139, 142 (6th Cir. 1959), revg. on other grounds T.C. Memo. 1957-105.

Petitioners have stipulated, however, that as of the end of

---

[6](...continued)
        or December of '92--excuse me--he [Jack] had
        $125,000 in cash that belonged to you in his safe.

A.  Correct.

Q.  Would he have had $125,000 in December of '94
    --or, excuse me--December of '93?

A.  I don't know.

Q.  Could he have?

A.  Probably.

Q.  What about December of '94?

A.  Probably he could have.

Q.  December of '95?

A.  He still could up to today.  I don't know.

each year in issue, they had cash on hand of $2,500. Assuming that the stipulation is correct, any cash hoard in excess of this amount obviously must have been depleted before December 31, 1993, in which case the omission of a cash hoard from the 1993 opening net worth could affect the results of the net worth analysis, as 1993 expenditures from such a cash hoard would represent a nontaxable source. Petitioners do not contend, however, and the evidence does not show, that they expended the $125,000 (or any specific amount thereof) during 1993.

Petitioners argue that since respondent's analysis reflects petitioners' liability on the Home Federal mortgage loan (as a liability owed to Home Federal's successor in interest, First Tennessee Bank), the net worth analysis must be adjusted to also include the $125,000 cash proceeds. The fallacy of this argument is that there is no proof that petitioners retained any cash proceeds from the mortgage loan after 1992. Even if we were to assume, for sake of argument, that petitioners at some point in 1992 had $125,000 cash on hand from the mortgage loan, the evidence does not foreclose the possibility, among others, that petitioners spent the $125,000 in 1992 on their residential property at 1037 Parham Place, which was collateral for the mortgage loan, or on one of their other properties which are included in the net worth analysis.[7]

---

[7] The 1037 Parham Place property is included in respondent's net worth analysis with a $160,000 value in the opening and
(continued...)

Petitioners increased their borrowings by $55,000 in late 1992 or early 1993, when they claim to have had a cash hoard in Jack's safe.  We believe that this circumstance also undermines their contention of a cash hoard; absent any explanation to the contrary, we find it unlikely that petitioners would incur an additional $55,000 in debt if they had $125,000 cash in Jack's safe.  Furthermore, we doubt that petitioner, being liable for a $135,000 mortgage note, would have turned the proceeds over to his father and yet have so little recollection of the circumstances and so little regard for the ultimate disposition of the funds.  We also find it unlikely that Jack would be unable to remember where he found a bank willing to accommodate his desire to be paid $135,000 in $100 bills on a third-party check.

C.  Other Attacks on Respondent's Net Worth Analysis

1.  Accounts Receivable

Petitioners argue alternatively that even if (as we have held) respondent permissibly used the net worth method, its component parts are, in a number of respects, incorrect.  On reply brief, petitioners argue that "Respondent's net worth [analysis] should not have included accounts receivables for Petitioner's car business since Petitioners are on a cash basis accounting method as shown on all three tax returns in question."

_____

[7](...continued)
closing net worth balances for each year in issue.  Thus, even if the value of the 1037 Parham Place property were understated in the net worth analysis, there would be no effect on the amount of unreported income determined for each year.

Contrary to this assertion, however, the Schedule C, Profit or Loss From Business, attached to petitioners' 1995 income tax return indicates that their used car business was on an accrual basis of accounting. Moreover, petitioners' accountant explained that petitioners' accounting method was not, in fact, a cash method but rather "a kind of a hybrid". From the accountant's testimony, it appears that for all years in issue, petitioners effectively reported income on an accrual basis, maintaining accounts receivable. Such receivables properly represent assets in a net worth analysis of a taxpayer who uses an accrual method of accounting. Cf. United States v. Vardine, 305 F.2d 60, 64 (2d Cir. 1962).

Petitioners contend that the accounts receivable figures used in respondent's net worth analysis are incorrect. Petitioners have failed, however, to offer credible evidence as to what the correct amount of their accounts receivable should be. In light of Jack's testimony that he discarded any documents regarding accounts receivable once they were paid off, the dearth of evidence is unsurprising. Jack testified in conclusory fashion that petitioners' net accounts receivable for 1993, 1994, and 1995 were $100,578, $77,999, and $47,880, respectively. Jack testified, without further explication, that these most recent figures "were taken directly from the sales contracts."

Jack's conclusory testimony does not credibly establish the amount of petitioners' accounts receivables. His credibility in this regard is undermined by petitioners' admission that Jack gave respondent's agent different accounts receivable figures during the examination and only came up with the new figures shortly before trial. Petitioners seem to invite us to rummage through their boxes of records, calculator in hand, and replicate Jack's calculations. This we decline to attempt.

Even if we were to assume, for sake of argument, that Jack has correctly tallied <u>gross</u> accounts receivable figures reflected in petitioners' records, we still would be unconvinced that his figures accurately reflect petitioners' <u>net</u> accounts receivable. Petitioners contend, based solely on Jack's testimony, that the receivables should have been discounted by 60 percent to reflect bad debts and repossessions. Apparently, Jack's figures reflect such a 60-percent discount. Petitioners have not substantiated the reasonableness or appropriateness of such a discount.[8]

Although the record is unclear on this point, it appears that the net accounts receivable figures used in respondent's net worth analysis were derived from information that Jack conveyed

---

[8] We do not quite comprehend petitioners' argument that these accounts receivable should be reduced both for bad debts and for repossessions. We understand the theoretical reduction of those accounts to represent bad debts, and as petitioners acknowledge, respondent has in fact made a minor reduction in the figures used to reflect some uncollectibility. We do not understand, however, why accounts receivable should be reduced for repossessions without making a corresponding increase to inventory.

to the examining agent. Although their clouded paternity does not inspire confidence that they are correct to the penny, the figures do not seem unreasonable. Petitioners propose as a finding of fact that respondent gave them a 10-percent discount on accounts receivable for 1993, 1994, and 1995. If we accept petitioners' proposed finding, and if (as it appears) Jack's figures reflect a 60-percent discount, then for each year in issue respondent's implied gross receivables figures were less than Jack's implied gross receivables figures.[9] Moreover, our examination of Murphy's records indicates that many, if not most, of its autos were sold for a modest downpayment (and often a trade-in), with most of the sales price being financed over a period of several months. It follows that, at the end of any given year, accounts receivable should represent a substantial part of petitioners' gross sales. On the Schedules C attached to their tax returns for the years in issue, petitioners reported that Murphy's had gross receipts of $448,870 for 1993, $371,278 for 1994, and $286,532 for 1995. The yearend accounts receivable figures used by respondent were $171,000, $105,200, and $99,000

---

[9] Specifically, if respondent's net accounts receivable figures reflect a 10-percent discount, the implied gross receivables figures for yearend 1993, 1994, and 1995 are $190,000 ($171,000/.9), $116,889 ($105,200/.9), and $110,000 ($99,000/.9), respectively. Similarly, if Jack's net receivables figures reflect a 60-percent discount, the implied gross receivables figures for these same periods are $251,445 ($100,578/.4), $194,998 ($77,999/.4), and $119,700 ($47,880/.4), respectively.

for the corresponding years. These numbers indicate that accounts receivable were 38 percent of gross sales at the end of 1993, 28 percent of gross sales at the end of 1994, and 35 percent of gross sales at the end of 1995. In the absence of more convincing evidence, we believe that respondent's accounts receivable figures are reasonable.

Petitioners contend that respondent never asked Jack about 1992 accounts receivable and that respondent's inclusion of $9,000 accounts receivable in their 1993 opening net worth is therefore arbitrary and without basis, thereby rendering the net worth analysis invalid. Respondent's inclusion of accounts receivable in petitioners' 1993 opening net worth operates to their detriment only insofar as respondent has understated the amount. Petitioners do not argue, and the evidence does not indicate, that petitioners had any amount of accounts receivable at the end of 1992. Hence, petitioners have not established that the $9,000 accounts receivable that respondent has included in their 1993 opening net worth is understated. Indeed, given that petitioner acquired Murphy's in December 1992, it seems likely that accounts receivable as of December 31, 1992, would be small in amount.

### 2. Accounts Payable

Petitioners contend that if their net worth is increased by accounts receivable, it should also be reduced by accounts payable. Petitioners contend that total liabilities as of year-end 1995 should be increased by a number of accounts payable that were outstanding on December 31, 1995. Petitioners offered documentary evidence of construction costs incurred in 1995 but not paid until 1996. On brief, respondent does not dispute that his net worth analysis omits these amounts from accounts payable but attacks the probative value of petitioners' evidence. On the basis of our detailed review of the evidence, we conclude and hold that $30,786.54 of such accounts payable should be included in petitioners' net liabilities as of year-end 1995 for purposes of the net worth analysis.

### 3. Value of Netherland Inn Road Property

In his net worth analysis, respondent included in petitioners' 1993 opening net worth $109,000 as the value of petitioners' property on Netherland Inn Road. Petitioners contend that the value should be increased to $127,000, based on Jack's testimony that petitioner added an improvement to the property "at a cost of approximately $18,000." The only other evidence on this point consists of the hearsay testimony of petitioner's out-of-State accountant. On the Schedule D, Capital Gains and Losses, attached to their 1993 return, petitioners

reported that they had acquired the Netherland Inn Road property in March 1991, that they had a "Cost or other basis" in the property of $109,000, and that they sold it in December 1993 for $115,000. From the evidence in the record, it is unclear that the $109,000 does not include the cost of the alleged improvement on the property. Petitioners have not explained why, if the property were worth $127,000 on January 1, 1993, as they allege, it would have been sold in December 1993 for $115,000, as they have reported. In sum, petitioners have failed to show that the $109,000 value used by respondent should be increased.

### 4. Alleged Undeposited Check

Petitioners also argue that a check to petitioner for $5,800, which was received in 1992 but not deposited until January 1993, should have been included in petitioners' 1993 opening net worth. In support of this contention, petitioners rely upon an exhibit incorporating the uncashed check. Petitioners failed, however, to offer this exhibit into evidence, and we lack an evidentiary basis for making the finding petitioners seek.

## II. Fraud

Section 6663(a) imposes a 75-percent penalty on any part of a tax underpayment due to fraud. The two elements of civil fraud under section 6663 are the existence of an underpayment and fraudulent intent. Conti v. Commissioner, 39 F.3d 658, 664-665

(6th Cir. 1994), affg. T.C. Memo. 1992-616.  Section 7454(a) provides that, in any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on respondent.  Respondent's burden of proof with respect to the issue of fraud is to be carried by clear and convincing evidence.  Rule 142(b).  Fraud is not to be presumed or based upon circumstantial evidence which creates merely a suspicion of fraud.  Wainwright v. Commissioner, T.C. Memo. 1993-302 (citing Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959)).

To support a finding of tax fraud, respondent must show that the taxpayer engaged in conduct with the intent to evade taxes that he knew or believed to be owing.  United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990).  Direct evidence of intent is often unavailable and unnecessary; the courts may infer fraudulent intent from strong circumstantial evidence.  Id.

In fraud cases, it may happen that, although the taxpayer fails to overcome the presumption of correctness as to the asserted deficiencies in tax, the Commissioner will also fail to establish that the same deficiencies were the result of fraud. "Both parties to a proceeding may fail through inadequate proof on the several issues."  Kashat v. Commissioner, 229 F.2d 282, 285 (6th Cir. 1956), affg. in part and revg. in part a Memorandum Opinion of this Court dated March 29, 1954.  "That this differing burden of proof in the Tax Court can have an important

dispositive effect has been pointed out by this court * * *.  As
was made clear * * *, the taxpayer's failure to overcome the
presumptive correctness of deficiencies in reported income even
over a period of consecutive years does not of itself create a
presumption of fraud."  Hawkins v. Commissioner, 234 F.2d 359,
360 (6th Cir. 1956), affg. in part, revg. in part, and remanding
T.C. Memo. 1955-110.

Respondent asserts that the fraud penalty is properly
imposed on petitioner based upon circumstantial evidence in the
form of several generally accepted indices, or "badges", of
fraud.  Respondent first urges that the asserted understatements
of income of $152,495 in 1993 and $139,540 in 1995 justify an
inference of fraud.[10]  Although systematic understatements of
income over an extended time can be persuasive evidence of fraud,
see, e.g., Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir.
1984), affg. T.C. Memo. 1982-603, such understatements may also
be consistent with negligence or a even a mistaken view of the
law.  See Carr v. Commissioner, T.C. Memo. 1978-408.

Respondent urges that petitioner's bookkeeping practices are
evidence of fraudulent intent.  We strongly suspect that
petitioner's hybrid-pooling method of tracking income falls short
of generally accepted accounting principles.  Petitioner,

---

[10] According to respondent's analysis, petitioners actually
overstated their 1994 income--a circumstance inconsistent with
fraud.

however, did not finish high school, and Jack attended only 3 weeks of college. Neither has any training in business record keeping. Respondent has failed to show clearly that petitioners' unsatisfactory bookkeeping practices were the result of fraudulent intent.

Respondent also criticizes petitioner's practice of submitting a one-page summary of receipts and expenditures to Jack's accountant, an old friend from Florida, as a basis for preparing petitioners' tax returns. The accountant testified credibly, however, that after respondent's examination commenced, he reviewed certain of petitioners' records and was able to tie business expenses reported on petitioners' returns to invoices contained in the records. We also have taken into account testimony of respondent's agent that the 1993 used-car dealership records she examined closely substantiated the income reported on petitioners' 1993 return and that the construction business yielded little income. We further note that respondent's agent did not examine the records for 1994 and 1995.

Respondent contends that petitioner's records do not necessarily reflect off-the-books income that is reflected in the net worth analysis. Respondent, however, has not demonstrated any specific instances wherein any such income was omitted or wherein the records were otherwise falsified. Respondent's examining agent testified that she believed the unreported income indicated by the net worth analysis was attributable to

petitioners' overstatement of cost of goods sold. Respondent has not demonstrated that any such overstatements were fraudulent, rather than the result of negligence or a misunderstanding of the law.

Respondent also accuses petitioner of concealing one of his bank accounts from respondent's agent, thus indicating a fraudulent intent to conceal income. This bank account, NationsBank Account No. 5500026-201-8, was excluded from the net worth analysis attached to respondent's Answer to Amended Petition but was included on the net worth analysis attached to respondent's brief. There is no direct evidence that petitioner attempted to conceal this account. Respondent's agent conceded at trial that petitioner signed a release permitting her to examine his records at NationsBank. The agent also testified that she did not review petitioner's records for 1994 and 1995. The evidence shows that Account No. 55000026-201-8 was not opened until 1994. We conclude that the evidence does not support a finding that petitioner deliberately failed to disclose this account.

Nor has respondent convinced us that petitioner's extensive use of cash is evidence of fraud. We believe it likely that the clientele of Murphy's, most of whom were expected to make payments on their own paydays, themselves dealt extensively in

cash.  We also find credible Jack's explanation that many of his contractors, who worked until after the banks had closed, preferred that he pay them in cash.

Accordingly, while we have suspicions that petitioner's activities may have been fraudulent, we conclude that respondent has failed to adduce evidence to prove fraud clearly and convincingly.  Because respondent has not proved fraud, we turn to his alternative argument as to imposing accuracy-related penalties.

III.  Accuracy-Related Penalties

Respondent has proposed the section 6662(a) accuracy-related penalty against petitioners for each of the years in issue. Section 6662(a) authorizes respondent to impose a penalty in an amount equal to 20 percent of the portion of the underpayments that is attributable to the items set forth in section 6662(b). Section 6662(b)(1) includes any underpayment attributable to negligence or disregard of rules or regulations.  Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".  Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances). Negligence also includes any failure by the taxpayer to keep

adequate books and records or to substantiate items properly. See sec. 1.6662-3(b)(1), Income Tax Regs.

Petitioners bear the burden of proving that respondent's determinations of these accuracy-related penalties are erroneous. See Rule 142(a); ASAT, Inc. v. Commissioner, 108 T.C. 147, 175 (1997).[11] Taxpayers are not liable for accuracy-related penalties if they show that they had reasonable cause for the underpayment and that they acted in good faith. See sec. 6664(c).

Petitioners failed to maintain adequate records to substantiate the deductions claimed on their tax returns for the years in issue. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Petitioners' records were substandard and, when presented to the Court, chaotic. Petitioners' claims that they accurately reported their income for the years in issue are not aided by their submitting obviously indecipherable records into evidence. Petitioners blame respondent's agents for the jumbled nature of the records, but they must also concede that they, or Jack, or their representatives, had some hand in presenting the records as they now exist. Having examined the records closely, we believe

---

[11] Sec. 7491(c) places the burden of production on the Commissioner with respect to the liability of any individual for any penalty, addition to tax, or additional amount, in court proceedings arising in connection with examinations commencing after July 22, 1998. The petition in the instant case was filed in 1996. Accordingly, sec. 7491(c) is inapplicable.

that, with some assiduous efforts, petitioners could have re-sorted the records at least into their original state.

We are unmoved by petitioner's explanation that he trusted his father and signed anything that Jack put in front of him. Although petitioner lacks higher education, we believe that he was aware of his responsibility to report his income accurately. He did not do so.

Accordingly, we conclude that petitioners' underpayments are attributable to negligence or disregard of rules or regulations. Thus, we hold that petitioners are liable for accuracy-related penalties under section 6662(a) for 1993 and 1995, based on the amount of their underpayments for those years, to be determined in the Rule 155 computations.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.