Guilio J. CONTI and Edith Conti, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 93–1281.

United States Court of Appeals, Sixth Circuit.

Argued March 18, 1994.

Decided Nov. 9, 1994.

Paul T. Mengel (briefed), Robert B. Pierce (briefed), Mark C. Pierce (argued and briefed), Pierce & Pierce, Birmingham, MI, for appellants.

Gary A. Allen, Acting Chief (briefed), Kenneth L. Greene, David A. Shuster (argued), U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, for appellee.

Before: MARTIN, RYAN, and SUHRHEINRICH, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

■ Guilio J. Conti and his wife Edith appeal the Tax Court's 99 T.C. No. 20, 1992 WL 238783; T.C.Memo 1992–616, 1992 WL 294942 (1992) finding that they substantially understated their income for 1986 and 1987. The Contis also challenge the penalties imposed for fraud and understatement of their tax liability. We affirm.

The record in this case is extensive and confusing, and we summarize only those facts necessary for an understanding of this appeal. Because of the lack of supporting documentation and because of large cash transactions, the Contis' tax deficiencies were calculated using the net worth method. We begin by describing the taxpayers' work and financial history. Guilio and Edith Conti are a married couple in their middle seventies, and they have three adult children. Mr. Conti, who is now retired, dropped out of school after the fifth grade and began working at the age of fourteen. From 1937 to 1985 he was employed by Ford Motor Company, except for a period of service in the United States Army from 1942 to 1945. Mr. Conti earned about $60 a month in the army, and earned approximately $679,206 from 1971 to 1985 as a Ford employee. He also claimed to have inherited roughly $23,000 from his relatives between 1970 and 1984. During 1984 he testified he withdrew $190,000 from a deferred annuity which had been purchased for $150,000 in 1981.

Edith Conti testified she handled all of the family finances after marrying Mr. Conti in 1949. In 1981, upon the death of her brother, Alfred D'Annunzio, Mrs. Conti inherited jointly-held property worth roughly $237,000. In the early 1980s, at the suggestion of their son, Mark, the Contis started a business involving the purchase, renovation, and sale of real properties. In 1986 and 1987, the Contis bought and sold at least twelve such properties. In several of these transactions, financial institutions loaned money to the Contis for financing the purchase. The Contis maintained numerous bank and brokerage accounts in the 1980s. For example, in 1986 and 1987, Mrs. Conti made more than three hundred deposits into these accounts, totaling more than $950,000. At least one hundred and thirty of these transactions, totaling more than $375,000, were cash deposits. Finally, during 1985 and 1986, the Contis invested roughly $105,000 in various securities, and realized a profit of more than $18,000 from the sale of these securities.

The Contis' 1986 and 1987 tax returns were prepared by certified public accountant Leonard Grey. In March 1988, Internal Revenue Service Agent Pamela Keysor began auditing these tax returns. Given our self-enforcement of the tax laws, taxpayers are required to retain for a reasonable time the documents which support the entries on their tax returns. Here little was available, and thus the revenue agent had to begin by determining the taxpayers' net worth. This method consists of computing a taxpayer's excess of assets at cost, over liabilities, at the beginning and end of a year. The difference between these two figures is the increase in net worth, which is adjusted by adding non-deductible expenditures and subtracting gifts, inheritances, loans, previously-taxed cash on hand, and the like. While this is clearly a simplistic analysis, generally the final figure obtained from these calculations is considered the taxpayer's taxable income. Here, although the record before us is voluminous, closing statements, loan documents, and checks are missing.

On April 18, Agent Keysor met with Mrs. Conti, Leonard Grey, and the Contis' son, Mark Conti. At this meeting, Mrs. Conti told Keysor that, on December 31, 1985, the Contis had about $100,000 in cash at their residence, and "over $20,000" in cash in a safe deposit box. Mrs. Conti stated that these cash reserves were drawn partly from a $200,000 to $250,000 gift from her mother, and partly from a $300,000 inheritance from her brother. Keysor's handwritten notes from the meeting state that "taxpayer keeps large sum of cash on hand, ($150,000)." Mrs. Conti did not claim at this time that the source of the cash was Mr. Conti's earnings from Ford and military service, nor did she claim that the source of these funds was a series of loans from their son, Mark Conti.

Leonard Grey, after meeting with Keysor again on April 27, met with Mark Conti to prepare a response to Agent Keysor's questions. Grey informed Mark Conti of the amount of cash on hand, or the "cash hoard," that would be required to account for the Contis' net worth increases in 1986 and 1987. On May 23, Grey sent a letter to Agent Keysor stating that the Contis' cash on hand, at the beginning of 1986, was $450,000. The information in this letter was provided to Grey by Mark Conti. Rejecting this information as not supported by documentation, a determination was made to proceed with a deficiency notice. The Commissioner, using the $150,000 cash on hand figure from Agent Keysor's notes, initially computed the Contis' tax deficiency for 1986 to be $116,410, and their tax deficiency for 1987 to be $390,227. These deficiencies were based on what the Commissioner determined to be over $1,300,000 in unreported income accumulated by the Contis during 1986 and 1987. The Commissioner also determined that the Contis were liable for additions to tax for fraud, under Section 6653(b), and substantial understatement of income tax, under Section 6661. On April 11, 1990, the Commissioner issued a notice of deficiency. On July 6, the Contis sought relief in the Tax Court, challenging the Commissioner's deficiency determination and the additional penalties for fraud and understatement of income tax. The Commissioner subsequently altered the determination to reflect amended tax deficiencies of $206,702 for 1986, and $322,343 for 1987.

The trial before the Tax Court began on September 30, and ended on October 3, 1991. The Commissioner and the Contis stipulated to the figures in the Commissioner's net worth analysis, with the exceptions of the amounts of the cash hoard and certain loans allegedly made by Mark Conti to his parents. At trial, the Contis contended that the actual amount of their cash hoard, as of December 31, 1985, was roughly $800,000. They claimed that they had amassed this hoard from the following sources: (1) a frugal lifestyle; (2) double and triple shifts worked by Mr. Conti at Ford, without any vacation time; (3) cash gifts from Mrs. Conti's mother, who did not work but had allegedly accumulated cash from the sale of wine and beer

during Prohibition; (4) sixteen years of expense-free living with Mrs. Conti's mother in the 1950s and 1960s; (5) Mr. Conti's sales of Nazi weapons during and after World War II; and (6) various bequests and gifts from family members.

The Contis also asserted at trial, for the first time, that Mark Conti had loaned them the separate, aggregate sum of approximately $582,000 during the period from 1986 to 1987. Mark Conti testified that his adjusted gross income for those years was $72,000, earned by syndicating video games, rehabilitating real estate for his parents and others, and financing and developing tennis clubs. Mark Conti also testified that he had roughly $75,000 in savings at the time, plus $170,000 from a divorce settlement. Even with his relatively low income figures, he further testified that, in the period from 1980 to 1985, he obtained roughly $600,000 to $700,000 in undocumented, unsecured loans from tennis clubs, individuals, and various banks, and loaned some of this money in turn to his parents. Mark Conti's loans to his parents were also undocumented, and stated no due date nor interest rate. The Contis, moreover, did not mention these loans to at least one of the expert witnesses they retained to calculate their net worth and taxable income for 1986 and 1987.

In order to corroborate the amount of their claimed cash hoard, the Contis allegedly told someone representing the Commissioner that they were each willing to undergo a polygraph examination. This offer was rejected. The Contis' counsel, however, without informing either the Tax Court or the Commissioner's counsel, arranged for Mr. and Mrs. Conti to undergo polygraph tests. At trial, the Contis asserted that they passed the tests, corroborating as to their cash hoard claim, and their counsel attempted to introduce the test results into evidence to support this conclusion. After an evidentiary hearing, the Tax Court held that the polygraph tests were unreliable, and, therefore, inadmissible.

On January 13, 1993, the Tax Court entered judgment in favor of the Commissioner. Although it found that the Contis did not

lead a lavish lifestyle, the court discredited the Contis' testimony regarding the amount of their cash hoard, and the loans from Mark, as implausible and unconvincing. The court held that the Commissioner had established a reasonable, non-arbitrary opening net worth of $150,000 to support the deficiency determination, and had also negated possible non-taxable income sources as required under *Holland v. United States*, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954). The Tax Court stated in its opinion that the Contis' mortgaging of real property, extensive investment activities, regular bank deposits, lack of documentation regarding purported transactions, and inconsistent pretrial allegations regarding the amount of their cash hoard all weighed against a finding that they had more than $150,000 in cash on hand at the beginning of 1986.

The Tax Court further held that the Commissioner had proven the two elements of fraud under 26 U.S.C. § 6653(b), existence of an underpayment and fraudulent intent, by clear and convincing evidence. With respect to fraudulent intent, the court listed what it considered to be the following "badges of fraud" in the present case: (1) large understatements of income; (2) inadequate records; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; and (5) dealings in cash. *See Bradford v. Commissioner*, 796 F.2d 303, 307–308 (9th Cir.1986) (enumerating "badges" indicative of fraudulent intent). Finally, the court held the Contis liable for additions to tax for substantial understatement of income tax, under 26 U.S.C. § 6661, for essentially the same reasons the court advanced in support of its deficiency determination. The Contis subsequently filed this timely appeal challenging the deficiency determination, the penalties for fraud and understatement of income tax, and the exclusion of the polygraph evidence.

■ As we assess the issues raised by the taxpayers in this appeal, we review the Tax Court's factual findings under a clearly erroneous standard, and review legal questions *de novo*. *Rose v. Commissioner*, 868 F.2d 851 (6th Cir.1989).

■ The first issue we address is that of the polygraph tests. The taxpayers maintain that the Tax Court erred in holding the results of these tests to be inadmissible. The court gave two independent reasons for its holding: (1) the tests did not satisfy the "general acceptance" standard of *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), as applied to Federal Rule of Evidence 702; and (2) this Circuit's decision in *Barnier v. Szentmiklosi*, 810 F.2d 594 (6th Cir.1987) (holding that "unilateral" polygraph examinations are inadmissible, because negative results presumably would not be disclosed, and nothing is at stake). The Contis now argue that the results of the tests should have been admitted because the United States Supreme Court recently rejected the *Frye* standard, holding that general acceptance is not a prerequisite for the admissibility of scientific evidence under Rule 702, and that it is only one of a number of factors that a court should assess in determining whether to admit such evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, — – —, 113 S.Ct. 2786, 2794–97, 125 L.Ed.2d 469 (1993).

The Tax Court, however, also relied on two other Sixth Circuit cases finding unilateral polygraph tests inadmissible under Federal Rule of Evidence 403. *See Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988); *Barnier*, 810 F.2d at 596–97. If this basis for exclusion is valid, we need not consider whether the Tax Court actually conducted a proper analysis of the polygraph evidence under the Supreme Court's decision in *Daubert*, with respect to Federal Rule of Evidence 702, but can affirm the denial of the polygraph results on an independent basis.

In *Barnier*, which involved a civil suit for malicious prosecution, we concluded that the trial court erred in admitting polygraph evidence for the purpose of bolstering the plaintiffs' credibility regarding damages because the plaintiffs submitted to the polygraph test voluntarily, the defendants were unaware of the test, and the results of the test presumably would not have been disclosed if they had been unfavorable. *Barnier*, 810 F.2d at

597. Given these circumstances, we have concluded on several occasions that the prejudicial effect of such polygraph test results outweighs their probative value under Federal Rule of Evidence 403, because the party offering them did not have an adverse interest at stake while taking the test. *Id.; see also United States v. Harris,* 9 F.3d 493, 502 (6th Cir.1993) (trial court did not abuse discretion in excluding criminal defendant's statement that he was willing to take polygraph test, because defendant did not agree that results of test, if taken, would be admissible); *Wolfel,* 823 F.2d at 974 (same, in the context of a prisoner's statement in a civil rights action against a corrections officer).

The Contis argue that, rather than apply the reasoning of this line of cases, we should look to the rationale of an Eleventh Circuit decision, *United States v. Piccinonna,* 885 F.2d 1529 (11th Cir.1989) (en banc). In *Piccinonna,* the Eleventh Circuit stated that polygraph evidence is admissible by stipulation between the parties or when used to impeach or corroborate the testimony of a witness during trial. *Id.* at 1536. In this latter situation, admission is subject to three preliminary conditions:

> *First, the party planning to use the evidence at trial must provide adequate notice to the opposing party that the expert testimony will be offered.* Second, polygraph expert testimony by a party will be admissible only if the opposing party was given reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions. . . .
>
> Finally, whether used to corroborate or impeach, the admissibility of the polygraph administrator's testimony will be governed by the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony. . . . Even where the above three conditions are met, admission of polygraph evidence for impeachment or corroboration purposes is left entirely to the discretion of the trial judge.

(emphasis added). *Id.* While we have not adopted this view in full, our decisions in *Barnier* and *Wolfel,* are equally applicable to the present case. *Groves v. Ring Screw Works, Ferndale Fastener Div.,* 882 F.2d 1081, 1086 (6th Cir.1989), *rev'd on other grounds,* 498 U.S. 168, 111 S.Ct. 498, 112 L.Ed.2d 508 (1990). Nonetheless, *Piccinonna* is not entirely inconsistent with our polygraph precedent, as the Eleventh Circuit stated the trial court may still exclude such evidence, in its sole discretion, under Rule 403. *Piccinonna,* 885 F.2d at 1536. *Barnier* and *Wolfel,* which we apply here, state a stricter rule of exclusion—that unilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403. *Wolfel,* 823 F.2d at 973–75; *Barnier,* 810 F.2d at 597.

Here, neither the Tax Court nor the Commissioner were aware that the Contis voluntarily and unilaterally arranged for polygraph tests after the Commissioner refused to agree to such tests. While the prejudicial effect of the tests were not as severe as in *Barnier* and *Wolfel,* the Tax Court properly relied on these cases as an independent basis to deny the admission of the polygraph evidence.

The Contis next assert that the Tax Court improperly used an arbitrary opening net worth of $150,000, and that the decision was against the "great weight" of the evidence. The Commissioner bears the burden of establishing an opening net worth with "reasonable certainty," and must either show a likely source of taxable income or negate possible sources of non-taxable income in using the net worth method to support a deficiency determination. *Holland,* 348 U.S. at 135–38, 75 S.Ct. at 135–37; *United States v. Massei,* 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958) (per curiam). The Commissioner's deficiency determination is presumptively correct, absent several exceptions not present here, and, once it is made, then the burden shifts to the taxpayer to prove that the determination is erroneous or arbitrary. *Kearns v. Commissioner,* 979 F.2d 1176, 1178 (6th Cir.1992). Here, the Tax Court, using its factual findings, held that the Commissioner's determination, as adjusted, was correct because the Commissioner had negated all possible sources of non-taxable income claimed by the Contis. These possible sources of non-taxable income were limit-

ed to the claimed cash hoard and the alleged loans from Mark Conti. The remainder of the net worth figures were stipulated. Once again we review the Tax Court's factual findings, including its ultimate deficiency determination, for clear error. *Id.; Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989).

The taxpayers argue that the record does not support the findings of large amounts of unreported income in 1985 and 1986. They maintain that the Tax Court erred by not crediting their unrebutted testimony regarding the cash hoard and the loans from Mark Conti. Generally, a taxpayer's unimpeached, competent, and relevant testimony "may not be arbitrarily discredited and disregarded" by the court. *Loesch & Green Const. Co. v. Commissioner,* 211 F.2d 210, 212 (6th Cir.1954). However, the Tax Court, like any other court, "may disregard uncontradicted testimony by a taxpayer where it finds that testimony lacking in credibility," *Lerch v. Commissioner,* 877 F.2d 624, 631 (7th Cir.1989); *Estate of DeNiro v. Commissioner,* 746 F.2d 327, 331 (6th Cir.1984), or finds the testimony to be "improbable, unreasonable or questionable." *Lovell & Hart, Inc. v. Commissioner,* 456 F.2d 145, 148 (6th Cir.1972) (per curiam) (quoting *Commissioner v. Smith,* 285 F.2d 91, 96 (5th Cir.1960)). Just as with an administrative law judge in a proceeding before the National Labor Relations Board or Social Security Administration, we give deference to the Tax Court's credibility findings because of the court's opportunity to observe the witnesses and their demeanor when they testify. Once the Tax Court finds that the taxpayer's testimony lacks credibility, "if the taxpayer has offered no other evidence in support of his position, the Tax Court has no choice but to rule for the Commissioner, since the taxpayer has failed to carry his requisite burden of proof." *Lerch,* 877 F.2d at 631. Such is the case here with the Contis. They have offered virtually no evidence to support their burden of proof.

Here, the Tax Court legitimately characterized the Contis' testimony regarding their purported $800,000 cash hoard and loans from Mark Conti as improbable, unreasonable, and unbelievable. In making this finding, the court observed that the Contis' testimony was inconsistent with their earlier statements, made to Agent Keysor both in person and in Leonard Grey's letter setting out a smaller cash hoard. There just was no documentation or other credible evidence introduced during a three-day trial to support the Contis' claims. The Contis now contest the evidentiary weight given to their earlier statements, and assert that the burden of proof with respect to the arbitrariness of the deficiency determination shifted back to the Commissioner because of the inaccuracies in the original notice of deficiency. It is well-established, however, that after the Tax Court and the Commissioner correct inaccuracies in the original deficiency notice, as happened here, the burden of proof remains with the taxpayer to prove that the ultimate deficiency determination is erroneous or arbitrary. *Kearns,* 979 F.2d at 1178. In that regard, the Tax Court did not err in finding that the Contis possessed a $150,000 cash hoard, a figure the Commissioner established with reasonable certainty based on Mrs. Conti's statements to Agent Keysor. The Contis also argue that the tax court judge unfairly "intervened" during their cross-examination of Agent Keysor in order to prevent her from admitting that the $150,000 cash hoard figure was arbitrary. We have examined the transcript of the proceedings before the Tax Court, and find this argument to be completely meritless. The Tax Court's ultimate deficiency determination, which followed from its cash hoard finding and its rejection of Mark Conti's testimony regarding loans to his parents, also is not clearly erroneous nor arbitrary, because the Contis did not come forward with documentary evidence to meet their burden of proof on that issue. Thus, the Tax Court did not err by imposing the statutory penalty, under 26 U.S.C. § 6661, for understatement of income tax.

The Contis further maintain that the Tax Court erred in imposing an additional tax penalty for fraud. The two elements of fraud are existence of an underpayment and fraudulent intent. 26 U.S.C. § 6653(b). The Commissioner bears the burden of establishing fraud by clear and convincing evidence, and we review the Tax Court's factual finding

of fraud for clear error. *Foster v. Commissioner,* 487 F.2d 902, 903 (6th Cir.1973) (per curiam). Here, the Tax Court did not err in finding that the Commissioner had established fraud, given the Contis' implausible and undocumented allegations, their extensive dealings in cash, and their large understatements of income.

Finally, both parties agree that the Tax Court made a computational error in determining the Contis' 1986 tax deficiency. Although the Contis' real estate investments at the end of 1985 were stipulated to be $255,-630, the Tax Court used the figure of $225,-630 in calculating the Contis' 1986 net worth. The Tax Court then based its deficiency determination on the net worth calculation. Accordingly, we affirm the judgment of the Tax Court on the merits for the foregoing reasons, but remand the case for correction of the mathematical error, and recalculation of the Contis' 1986 deficiency.