NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0597n.06
Filed: October 3, 2008

No. 07-1869

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PENO TRUCKING, INC., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES TAX COURT |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner-appellant Peno Trucking, Inc. ("Peno Trucking") appeals both the Tax Court's classification of its truckers as employees and the Tax Court's determination that Peno Trucking was not entitled to relief from tax liability under § 530 of the Revenue Act of 1978. For the following reasons, we reverse the decision of the Tax Court.

I.

Peno Trucking was incorporated in the State of Ohio on December 23, 1993. Its principal place of business was in Warren, Ohio. Throughout the period in question, Peno Trucking was incorporated as a Subchapter S Corporation under Internal Revenue Code §§ 1361 *et seq.* From 1997 through 1999, Robert Peno, Sr. and his wife, Joann Peno, together owned 100% of the stock

-1-

of Peno Trucking; Robert and Joann Peno were also the officers of the corporation, with Joann Peno as the President and Robert Peno, Sr. as the Vice President.

In its Memorandum Findings of Fact and Opinion, the Tax Court summarized the stipulated facts regarding Peno Trucking's business operations as follows:

> During the periods at issue, petitioner owned approximately 15 tractor-trailers (trucks), which it leased to the Ohio Transport Corp. (Ohio Transport) pursuant to written lease agreements (leases). The leases required petitioner to transport freight and perform related services for Ohio Transport within a reasonable time in a safe, competent, lawful, and workmanlike manner, inform Ohio Transport daily as to the vehicles' locations and the shipments being transported, and pay all costs of operating the leased trucks and related equipment.
>
> Under the leases, petitioner was required to provide drivers to operate its trucks and be responsible for all work performed by the drivers and to confirm their work was performed in accordance with the leases. Consequently, petitioner was required to direct, supervise, pay, discipline, and discharge its drivers. Petitioner was also responsible for determining the days and hours per day the drivers worked, the routes traveled, and the order of picking up and delivery of shipments and ensuring that the drivers had the appropriate commercial drivers' licenses.
>
> The leases also required petitioner to submit completed drivers' logs to Ohio Transport and to "cooperate in the preparation, carrying and preservation of manifestos, bills of lading, way bills, freight bills, and other papers and records respecting the lading and the use of equipment, all in accordance with applicable laws and regulations".
>
> As compensation, petitioner received 75 percent of the total amount paid to Ohio Transport by its customers for each load hauled by a leased truck.
>
> These loads were hauled by petitioner's trucks or by individuals who owned their own trucks (owner-operators). A number of owner-operators hauled steel for Ohio Transport and were dispatched by petitioner. The owner-operators' employment relationship with petitioner is not at issue in this case.
>
> The leases required Ohio Transport to provide liability insurance for petitioner's trucks while they were "under dispatch". Otherwise petitioner provided the insurance. If a driver intentionally damaged a truck or its cargo, he or she was responsible for the damage, to the extent it was not insured.

(footnotes omitted).

Peno Trucking entered into an agreement with each of its drivers during the dates in question which explicitly provided that the drivers were independent contractors and not employees. The agreement stated, in part, as follows:

> Peno Trucking Inc. and Operator agree and understand that Operator is not an employee or agent of Peno Trucking Inc. Operator is an independent contractor and Peno Trucking Inc. shall not direct in any manner the means or method by which Operator shall perform his occupation. Operator understands that Peno Trucking Inc. from time to time contracts with other persons or corporations, to transport goods via Peno Trucking Inc. trucks and equipment. While not an employee of such other persons or corporations, Operator shall, at all times applicable hereto, work at the direction and control of such persons or corporations.

> Peno Trucking Inc. agrees to pay Operator at the percentage of ___ per total gross pay per load. Additionally, Peno Trucking Inc. shall be responsible for all maintenance of Peno Trucking Inc. equipment, all fuel, oil, tolls, permits, and road fuel taxes incurred by Operator on such dispatched trips in Peno Trucking Inc. equipment.

> Operator agrees and understands that he is solely responsible for payment of all income and withholding taxes, Social Security and unemployment compensation. In accordance with the terms of this agreement, Peno Trucking Inc. will supply Operator with an IRS Form 1099 at the end of each calendar year.

> Operator understands and agrees that he cannot obligate, contract or incur any indebtedness on behalf of Peno Trucking Inc.

The Tax Court further explained the details of the relationship between Peno Trucking and the drivers as follows:

> Petitioner's drivers were not obligated to accept petitioner's request to transport a load, to work on any particular day, or work any particular schedule. If a driver chose not to haul a load or work for a period of time, he or she was not disciplined or sanctioned. Petitioner and the drivers were entitled to terminate their relationship at any time.

> Petitioner provided all necessary equipment required to secure the cargo hauled on its trucks. However, petitioner's drivers were free to supply any additional equipment

-3-

at their own cost. Drivers paid for their own gloves, hand tools, and meals. If a driver's relationship with petitioner was severed, the driver was free to take any equipment or accessories he or she had provided.

Petitioner paid for all fuel, oil, highway use taxes, and normal maintenance and repairs required to operate its trucks. Petitioner was solely responsible for determining the nature and timing of any repairs and/or maintenance of its trucks, and its mechanics performed all the maintenance and repairs. The drivers were not required to make any repairs or perform any maintenance to the trucks, but they were obligated to comply with the Federal motor carrier safety regulations, including those provisions which required pretrip inspections.

Drivers were paid, on a weekly basis, between 23 percent and 27 percent of the 75 percent petitioner received for each hauled load. The more loads a driver hauled each week, the more money he or she earned.

During the periods at issue, petitioner filed Forms 1099MISC, Miscellaneous Income, for each of its drivers who worked under the agreement.

In 1997, 1998, and 1999, respondent reclassified as employees a total of 29, 24, and 21 drivers, respectively. Of the drivers who were reclassified, 13 had contracted with petitioner for more than 2 years and 4 had contracted with petitioner for more than 3 years.

(footnotes omitted). The Tax Court also described Peno Trucking's day to day operations as follows:

When Ohio Transport had freight which needed to be transported, ordinarily in the Midwest and frequently to States adjoining Ohio, it or a mill working with Ohio Transport would contact petitioner and instruct it as to the specifications of the particular job. If petitioner had a truck available to haul the load, it would offer the job to one of its drivers. If a driver was unavailable or unwilling to accept the load, then the load was offered to another driver.

If a driver accepted the job, petitioner advised the driver, in accordance with Ohio Transport's or the mill's directives, of the time to pick up the load, the delivery location, and the expected delivery time. The drivers carried beepers so that petitioner could remain in contact while they were on the road. Petitioner did not direct the routes drivers were to use in either picking up or delivering loads. If a driver chose to drive on a toll road, the driver was responsible for paying the tolls. After a load was delivered, the driver could immediately return to petitioner's place of business with or without a return load.

During its years of operation, two of Peno Trucking's drivers filed claims for workers'

compensation because they suffered injuries during the course of their trucking activities. On May 18, 1995, Richard Chatfield filed his claim for workers' compensation. The Ohio Industrial Commission ("OIC"), in an order dated October 25, 1995, disallowed Chatfield's claim, finding that he "was not an employee of [Peno Trucking] on the date of injury herein. [Chatfield] was an independent contractor who had not secured Workers' Compensation for himself." The order did not provide the basis for its determination. Chatfield's appeal of the order was dismissed without prejudice.

Similarly, on June 26, 1997, Kenneth Jamison filed a claim for workers' compensation because of an injury he suffered during the course of his trucking activities. In an order dated August 25, 1997, the Bureau of Workers' Compensation ("BWC") denied Jamison's claim, finding that "[t]here is no proof of an employee/employer relationship between the injured worker and the listed employer." The BWC further explained that this decision was based on the signed agreement between Jamison and Peno Trucking. Pursuant to Jamison's appeal of the BWC order, the OIC vacated the BWC order and found that "[Jamison] was an independent contractor who had not secured Workers' Compensation for himself." The OIC did not explain the grounds of its decision and simply stated that "All evidence in the file was considered."

On September 12, 2003, the Commissioner of Internal Revenue (the "Commissioner") issued Peno Trucking a Notice of Determination of Worker Classification. In that determination, the Commissioner stated that certain identified drivers were in fact employees of Peno Trucking and not independent contractors. In addition, the Commissioner concluded that Peno Trucking was not entitled to relief from employment taxes under § 530(a) of the Revenue Act of 1978. The Commissioner then went on to calculate the additional taxes owed by Peno Trucking. Peno

Trucking appealed the Commissioner's determination pursuant to 26 U.S.C. § 7436. In that appeal, Peno Trucking argued that the truck drivers in question were independent contractors and not employees. In addition, Peno Trucking claimed that it had not treated the truckers in question as employees, had filed all federal tax returns consistent with this treatment, and had a reasonable basis for doing so – the order of the OIC concluding that both Chatfield and Jamison were not employees, but independent contractors. Thus, Peno Trucking claimed its tax liability should have been terminated under § 530 of the Revenue Act of 1978's safe harbor provisions.

The Tax Court found in favor of the Commissioner, concluding that the relevant factors indicated the truckers in question were employees and not independent contractors. Furthermore, the Tax Court found that Peno Trucking could not have reasonably relied upon the determination of either the BWC or the OIC in treating the truckers as independent contractors because (1) "[t]he record d[id] not indicate that the BWC, the OIC, or the court of common pleas evaluated the employment relationships of petitioner's former drivers, Chatfield and Jamison, through a common law analysis" and (2) "nothing in the record indicates the rulings concerning Jamison and Chatfield were relied upon at the time petitioner's employment decisions were made." Peno Trucking appeals the Tax Court's decision.

## II.

As a general rule "[w]e review the tax court's legal conclusions de novo and its factual findings under the 'clearly erroneous' standard." *Zack v. Comm'r*, 291 F.3d 407, 412 (6th Cir. 2002); *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 777 (6th Cir. 2006) ("We review the Tax Court's factual findings for 'clear error' and its application of law *de novo*."); *MTS Int'l Inc. v. Comm'r*, 169 F.3d 1018, 1021 (6th Cir. 1999) ("This court reviews the tax court's legal conclusions

de novo and its findings of fact under the 'clearly erroneous' standard."). In turn, "[f]actual findings are clearly erroneous if, based upon the entire record, the reviewing court is 'left with the definite and firm conviction that a mistake has been committed.'" *Zack*, 291 F.3d at 412 (quoting *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001)). This tracks the language of 26 U.S.C. § 7482(a) which states "[t]he United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury . . . ." *Cf. Freytag v. Comm'r*, 501 U.S. 868, 891 (1991) (noting that the standard under 26 U.S.C. § 7482(a) "contrasts with the standard applied to agency rulemaking").

Although this court has in the past applied the clearly erroneous standard to the employee-independent contractor question, it has done so only when the dispute hinged primarily on factual determinations. *Lanigan Storage & Van Co. v. United States*, 389 F.2d 337, 341 (6th Cir. 1968). Indeed, in *Lanigan Storage*, this court cited precedent from the Ninth Circuit, which indicated that, when courts below make findings on such issues "*as a fact*," we review the conclusion for clear error. *Id*. (emphasis in original) (citing *McGuire v. United States*, 349 F.2d 644 (9th Cir. 1965)). And, only applying the clear-error standard to the factual determinations underlying the employee-independent contractor distinction comports with both *Lanigan Storage*'s analysis of the tax court's role as factfinder and this court's analysis of the distinction in other contexts. *See, e.g.*, *Trs. of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005) (stating in the ERISA context that "[t]his court applies de novo review to the question of whether an individual is an employee or an independent contractor"). We therefore review the facts underlying the Tax Court's determination that the truckers in question were employees for clear

error, while reviewing its legal conclusions *de novo*. *But see Spicer Accounting v. United States*, 918 F.2d 90, 92 (9th Cir. 1990) ("The determination of whether an employer-employee relationship exists involves a mixed question of law and fact. However, since the determination is predominantly one of fact, it is subject to a clearly erroneous standard of review." (internal citation omitted)).

III.

Employers are required to pay one half of the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101 *et seq.*, ("FICA") taxes assessed against their employees and withhold from "wages" the amount of FICA taxes owed by the employees themselves. *See Boles Trucking v. United States*, 77 F.3d 236, 238 (8th Cir. 1996) (citing 26 U.S.C. §§ 3101, 3102(a), 3402(a)). In addition, employers must pay Federal Unemployment Tax Act, 26 U.S.C. §§ 3301 *et seq.*, ("FUTA") taxes on the "wages" paid to their employees. 26 U.S.C. § 3301; *see also Boles Trucking*, 77 F.3d at 238. For the purposes of both FICA and FUTA taxes, "wages" is defined as "all remuneration for employment." 26 U.S.C. § 3121 (FICA); 26 § U.S.C. 3306 (FUTA). However, employers are not required to pay and withhold FICA and FUTA taxes in connection with payments to independent contractors. 26 C.F.R. 31.3121(d)-1 (FICA); 26 C.F.R. 31.3306(i)-1 (FUTA); *see also, e.g.*, *Hosp. Res. Pers. v. United States*, 68 F.3d 421, 424 (11th Cir. 1995); *Breaux & Daigle, Inc. v. United States*, 900 F.2d 49, 52 (5th Cir. 1990); *see generally United State v. Silk*, 331 U.S. 704, 712-14 (1947).

As a general rule, "the Commissioner's determination of tax liability is entitled to a presumption of correctness and . . . the burden is on the taxpayer to prove that the determination is erroneous." *Boles Trucking*, 77 F.3d at 239 (citing *Helvering v. Taylor*, 293 U.S. 507 (1935)). This principle applies "to the Commissioner's classification of a taxpayer's workers as employees, i.e.,

once such a determination is made, it is the taxpayer's burden to prove, by a preponderance of the evidence, that its workers are or were independent contractors." *Id.* Thus, in reviewing the Tax Court's conclusions, this court must determine whether the Tax Court clearly erred in concluding that Peno Trucking had not demonstrated by a preponderance of the evidence that the truckers in question were not employees, but instead independent contractors. *See Van Camp & Bennion*, 251 F.3d at 865.

For the purposes of FICA, the term "employee" includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2). The regulations promulgated pursuant to FICA and FUTA provide some additional guidance as to the definition of an employer-employee relationship:

> Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

26 C.F.R. 31.3121(d)-1 (FICA); 26 C.F.R. 31.3306(i)-1 (FUTA).

"The determination of an individual's status as an employee or an independent contractor has

been the subject of numerous decisions. It is settled that each case must stand on its own facts, in light of all the existing circumstances, and that no one facet of the relationship is generally determinative." *Azad v. United States*, 388 F.2d 74, 76 (8th Cir. 1968); *see also Silk*, 331 U.S. at 716. Despite this fact, "authorities seem to be in general agreement that an employer's right to control the manner in which the work is performed is an important if not the master test to be considered in determining the existence of an employer-employee relationship." *Azad*, 338 F.3d at 76. Nonetheless, courts typically consider the following factors in determining whether an employer-employee relationship exists: "(1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether or not the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating." *Weber v. Comm'r*, 60 F.3d 1104, 1110 (4th Cir. 1995); *Professional & Executive Leasing v. Comm'r*, 89 T.C. 225, 232 (T.C. 1987) (listing the same seven factors); *Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423, 428 (2d Cir. 1974) (listing the same seven factors); *Pack v. United States*, 434 F. Supp. 232, 234 (E.D. Tenn. 1977) (listing the same seven factors); *see also Silk*, 331 U.S. at 716. *But see Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984) ("In applying this test, the courts generally focus on five factors: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work."); Rev. Rul. 87-41, 1987-1 Cum. Bull. 296, 298-299 (compiling a list of twenty non-exhaustive factors when determining whether an individual was an employee or independent contractor). Indeed, these were

the same seven factors considered by the Tax Court below. Thus, in order to review the Tax Court's opinion, we consider each of these seven factors in turn as they apply to the instant case.

**(1)     The degree of control exercised by the principal over the details of the work**

As noted above, an employer-employee relationship is generally assumed to exist where "such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished." 26 C.F.R. 31.3121(d)-1 (FICA); 26 C.F.R. 31.3306(i)-1 (FUTA). In other words, "it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so." *Id*. "Thus, no actual control need be exercised, as long as the employer has the right to control." *Professional & Executive Leasing v. Comm'r*, 862 F.2d 751, 753 (9th Cir. 1988) (using a five-factor test); *see also McGuire v. United States*, 349 F.2d 644, 646 (9th Cir. 1965) ("The absence of need to control should not be confused with the absence of right to control. The right to control contemplated by the Regulations relevant here and the common law as an incident of employment requires only such supervision as the nature of the work requires."); *Air Terminal Cab, Inc. v. United States*, 478 F.2d 575, 580 (8th Cir. 1973) (stating that "it is the *right* to control which is determinative").

Moreover, "[w]here the nature of a person's work requires little supervision, there is no need for actual control." *Id*; *see also McGuire*, 349 F.2d at 646 (noting that the work in question required little supervision, but nonetheless the individuals in question were employees as the appellant maintained the right to control their work). Furthermore, "The mere fact that the workers set their own hours and determined when to take breaks did not make them independent contractors."

-11-

*General Inv. Corp. v. United States*, 823 F.2d 337, 342 (9th Cir. 1987).

In detailing the facts that supported its conclusion that Peno Trucking exercised control over the truckers consistent with an employer-employee relationship, the Tax Court stated:

> Pursuant to the leases with Ohio Transport, petitioner was responsible for hiring drivers, overseeing all work performed by the drivers, confirming their work was performed in accordance with the leases, and directing, supervising, paying, disciplining, and discharging the drivers.
>
> Petitioner determined the days drivers could work and controlled which loads the drivers would haul. Petitioner required the drivers to have appropriate commercial drivers' licenses, deliver the freight to certain places at certain times, maintain driving logs and other documents, and carry beepers. Petitioner, not the drivers, determined whether truck repairs were performed on the road or by its own mechanics and was responsible for all truck maintenance costs incurred in maintaining the trucks.

(footnote omitted.) Peno Trucking contends that some of these factual conclusions are clearly erroneous.

First, Robert Peno, Sr., stated at trial that the truckers were not required to carry beepers to stay in touch with him. However, two of the subcontract statements – both stipulated exhibits – include charges for lost pagers or beepers. Given this evidence, the Tax Court concluded that Peno Trucking "required its drivers to carry beepers, presumably so that it could maintain contact while the drivers were on the road." And, because of this evidence in the record, this conclusion is not clearly erroneous. *See Conti v. Comm'r*, 39 F.3d 658, 664 (6th Cir. 1994) (noting that "the Tax Court, like any other court, may disregard uncontradicted testimony by a taxpayer where it finds that testimony lacking in credibility, or finds the testimony to be improbable, unreasonable or questionable." (internal quotation marks and citation omitted)).

Second, Peno Trucking focuses on the fact that it did not control the rates for the freight

hauled by the truckers; in turn, because the truckers' income was a percentage of the income from the freight hauled, Peno Trucking argues that it did not control the amount of income earned by its truckers. However, this conclusion overlooks the fact that the different truckers received different percentages of income from the hauled freight. It would appear that the truckers negotiated the rate with Peno Trucking; in this way, Peno Trucking does appear to have controlled, to some degree, the income of the truckers.

Third, Peno Trucking emphasizes that the truckers could choose whether or not to accept a particular load to haul. Thus, Peno Trucking argues that the truckers controlled their own work. While this may be true, it also appears to be the case that once a trucker did agree to haul a particular load, Peno Trucking controlled many of the conditions under which that hauling was done. Indeed, in its lease with Ohio transport, Peno Trucking stated that it would be "solely responsible for directing, supervising, paying, discharging, disciplining and otherwise controlling and such drivers, helpers or other persons." This representation by Peno Trucking to Ohio Transport gives strong indication that Peno Trucking did in fact control the truckers in question.

We therefore conclude that the Tax Court did not clearly err in determining that Peno Trucking did exercise sufficient control over the truckers in question to indicate the existence of an employer-employee relationship.

**(2)      Which party invests in the facilities used in the work**

"The fact that a worker provides his or her own tools generally indicates independent contractor status." *Ewens & Miller, Inc. v. Comm'r*, 117 T.C. 263, 271 (T.C. 2001) (citing *Breaux & Daigle, Inc. v. United States*, 900 F.2d 49, 52 (5th Cir. 1990)).

The Tax Court, in considering this factor, found the following facts:

The drivers incurred some cost for tools and maintaining their licenses. However, these costs were insignificant when compared to petitioner's substantial investment to acquire and maintain the fleet of approximately 15 trucks. The drivers did not pay any of the costs of operating the trucks or transporting the freight. The agreement stated petitioner alone was responsible for all maintenance of its equipment, all fuel, oil, tolls, 21 permits, and road fuel taxes incurred by the drivers on dispatched trips while in petitioner's trucks.

(footnotes omitted.) In response, Peno Trucking emphasizes that the truckers could in fact provide their own tools and would be entitled to take those tools with them if they chose to no longer drive a Peno truck. In addition, the parties stipulated that the drivers were responsible for paying tolls incurred en route to picking up a load for hauling. The Tax Court noted these facts, but nonetheless concluded "[t]he relatively minor investment by the drivers and the substantial investment by petitioner support an employer-employee relationship." The Tax Court did not err in this evaluation. As a result, this factor also supports the existence of an employer-employee relationship.

### (3)    The opportunity of the individual for profit or loss

In evaluating this factor, the Tax Court stated the following:

The drivers were not paid an hourly wage or salary. They were paid 23 to 27 percent of the 75 percent petitioner received per load hauled, and the amounts earned depended entirely upon the number of trips they made. The drivers did not assume any risk of loss. As stated in the agreement, a driver could not incur any indebtedness on behalf of petitioner. This factor indicates an employer-employee relationship.

Based on these facts, the Tax Court concluded that "[t]his factor indicates an employer-employee relationship." In doing so, the Tax Court clearly emphasized the fact that the truckers were not exposed to risk of loss, while minimizing the import of the truckers' ability to profit by pursuing more hauling assignments. Emphasizing the risk of loss while minimizing the opportunity for profit comports with analysis of this factor in Revenue Ruling 87-41 (1987):

*Realization of Profit or Loss.* A worker who can realize a profit or suffer a loss as a

-14-

result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, *if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. . . .*

*Id*. (emphasis added). Indeed, the Tax Court has similarly emphasized the exposure to losses in weighing this factor. *See, e.g.*, *Jones v. Comm'r*, 94 T.C.M. (CCH) 230, 2007 Tax Ct. Memo LEXIS 251, at *9 (2007); *Hathaway v. Comm'r*, 72 T.C.M. (CCH) 460, P53 (1996); *Feivor v. Comm'r*, 69 T.C.M. (CCH) 2078, 1995 Tax Ct. Memo LEXIS 108, at *38-39 (1995). And, such an analysis ensures that the mere fact that an employer links salary to performance does not militate against finding that his workers are in fact employees. We therefore conclude that the Tax Court did not clearly err in determining that this factor also indicates the existence of an employer-employee relationship.

### (4) Whether or not the principal has the right to discharge the individual

As noted above, the right to discharge indicates the existence of an employer-employee relationship. *See, e.g.*, *Air Terminal Cab, Inc.*, 478 F.2d at 581. In evaluating this factor, the Tax Court made the following findings:

> The parties stipulated that petitioner retained the right to discharge its drivers and the drivers had a right to terminate their relationship with petitioner. However, at trial Mr. Peno testified that he personally would not terminate a driver; instead Ohio Transport or the mills would ban the driver. Mr. Peno's testimony as to this factor was self-serving and unreliable. This factor indicates an employee-employer relationship.

As this court has previously explained, "we give deference to the Tax Court's credibility findings because of the court's opportunity to observe the witnesses and their demeanor when they testify." *Conti v. Comm'r*, 39 F.3d at 664. Thus, " [o]nce the Tax Court finds that the taxpayer's testimony

-15-

lacks credibility, if the taxpayer has offered no other evidence in support of his position, the Tax Court has no choice but to rule for the Commissioner, since the taxpayer has failed to carry his requisite burden of proof." *Id*. (internal quotation and citation omitted). This is most notably the case here where the transcript of Robert Peno's testimony seems inconsistent on its face. Because of the Tax Court's credibility determination, this factor also supports a finding that an employer-employee relationship existed.

### (5) Whether the work is part of the principal's regular business

In its brief, Peno Trucking concedes that this factor supports a finding of an employer-employee relationship.

### (6) The permanency of the relationship

According to the Tax Court, "[t]he drivers worked in the course of petitioner's business rather than having a transitory relationship with petitioner. This factor supports an employer-employee relationship." However, as Peno Trucking correctly notes, the truckers were not required to work any particular hours or days. These facts make it somewhat difficult to determine whether there was, in fact, a "permanent" relationship. That being said, such a determination is a factual determination, which we review for clear error. Moreover, the absence of this factor has limited import in effecting the employee-independent contractor analysis. *See Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423, 430 (2d Cir. 1974) (finding the individuals in question to be employees despite their being transient and noting that the individuals in *Silk* were also transient and still deemed by the Supreme Court to be employees). We therefore conclude that the Tax Court did not clearly err in finding that this factor indicated the existence of an employer-employee relationship.

**(7)     The relationship the parties believe they are creating**

The record does provide evidence that Peno Trucking and its truckers believed they were creating an independent contractor relationship. Most notably, the contracts between Peno Trucking and its truckers specifically stated that the truckers were to be considered independent contractors. However, as noted by the Tax Court, "[i]f the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like." 26 C.F.R. 31.3121(d)-1(a)(3).

In sum, the factors detailed above weigh heavily in favor of finding an employer-employee relationship, combined with the fact that it is Peno Trucking's burden to prove by a preponderance of the evidence that the Commissioner erred in his assessment, *see Boles Trucking*, 77 F.3d at 239, the beliefs of the parties simply cannot undermine the Tax Court's conclusion. Therefore, based on the factual and credibility determinations of the Tax Court, we conclude that the truckers in question were employees of Peno Trucking.

IV.

Despite the foregoing conclusions, Peno Trucking can still avoid liability under the safe harbor provisions of § 530 of the Revenue Act of 1978.

Section 530 of the Revenue Act of 1978 ("§ 530") provides for the termination of tax liability if "for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period"; "all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's

treatment of such individual as not being an employee"; and the employer had a "reasonable basis for not treating such individual as an employee." Pub. L. No. 95-600, 92 Stat. 2763, 2885-86 (reproduced at 26 U.S.C. § 3401 note § 530 (a)(2)).[1] Among the grounds giving rise to a such a reasonable basis, § 530(a)(2) includes "judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer . . . ." *Id*. at 2885. Whether Peno Trucking can satisfy the "reasonable basis" requirement of § 530 is a question of law that we review *de novo*. *See Spicer Accounting v. United States*, 918 F.2d 90, 94 (9th Cir. 1990) (applying *de novo* review to whether the appellant had a "reasonable basis" for not treating the individuals in question as employees); *cf. United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (noting, in the Fourth Amendment context, that "[t]he question of whether a belief is reasonable is one we review de novo, since the reasonableness test is objective, not subjective").

Section 530 also provides a specific burden-shifting scheme: "If (i) a taxpayer establishes a prima facie case that it was reasonable not to treat an individual as an employee for purposes of this section, and (ii) the taxpayer has fully cooperated with reasonable requests from the Secretary of the Treasury or his delegate, then the burden of proof with respect to such treatment shall be on the Secretary." Pub. L. No. 104-188, 110 Stat. 1755, 1767 (reproduced at 26 U.S.C. § 3401 note § 530(e)(4)(A)). It is the petitioner's initial burden to establish his *prima facie* case by a preponderance of the evidence. *See Dains v. United States, Internal Revenue Service*, 82 A.F.T.R.2d (RIA) 5044, 1998 U.S. App. LEXIS 14924, at *21 (6th Cir. 1998) (applying a preponderance of the

---

[1]Section 530 of the Revenue Act of 1978 was initially intended to provide interim tax relief. However, although never codified, it was extended indefinitely by § 269 of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324, 552. It is reproduced in the notes following 26 U.S.C. § 3401. *See also Springfield v. United States*, 88 F.3d 750, 751 n.2 (9th Cir. 1996) (summarizing legislative history).

-18-

evidence standard to the reasonable basis showing under § 530); *see also Springfield*, 88 F.3d at 752-53 (applying a preponderance of the evidence standard despite Congress's "liberally construed" directive).

In the instant case, Peno Trucking argues that it has satisfied the requirements of § 530's safe harbor provision. As evidence of this claim, Peno Trucking notes that the Tax Court concluded that "[Peno Trucking] never treated the drivers as employees and consistently issued them Forms 1099-MISC." This comports with the tax returns Peno Trucking provided the Commissioner for the years in question, 1997-1999. Peno Trucking argues that the decisions of the OIC and the BWC issued in response to the workers' compensation claims of Chatfield and Jamison provided reasonable bases for treating the truckers in question as independent contractors.

We believe that Peno Trucking has clearly established a *prima facie* case that it was reasonable not to treat the truckers in question as employees, thus shifting the burden of proof to the Commissioner for the purposes of our § 530 analysis. Peno Trucking's tax returns for the years in question and representative contracts for the truckers in question constitute sufficient evidence to make out a *prima facie* showing that it had always treated the truckers in question as independent contractors and that it has always filed its tax returns in a manner consistent with this treatment.

Although the reasonable basis requirement presents a somewhat more complex issue, the legislative history for § 530 counsels finding that reliance on the decisions from the OIC and the BWC satisfy this inquiry. Section 530 was originally passed "to provide interim relief for taxpayers who are involved in employment tax status controversies with the Internal Revenue Service, and who potentially face large assessments, as a result of the Service's proposed reclassifications of workers . . . ." H.R. Rep. No. 1748, 95th Cong., 2d Sess. 5, *reprinted in* 1978-3 C.B. 629, 632 ["House

Report"]. To that end, § 530 was intended to "grant[] relief if a taxpayer had any reasonable basis for treating workers as other than employees." *Id*. at 632-33. Most notably, Congress intended "that this reasonable basis requirement be construed liberally in favor of taxpayers." *Id*. at 633. As the Ninth Circuit has stated, "[w]ithout question, Congress intended to protect employers who exercised good faith in determining whether their workers were employees or independent contractors." *General Inv. Corp. v. United States*, 823 F.2d 337, 340 (9th Cir. 1987); *see also McClellan v. United States*, 900 F. Supp. 101, 104-06 (E.D. Mich. 1995).

Given this purpose, it is not surprising that other courts have construed this "reasonable basis" standard as requiring reliance in-fact. *See, e.g.*, *303 West 42nd St. Enters. v. IRS*, 181 F.3d 272, 277 (2d Cir. 1999) (focusing its inquiry on whether there the appellant "in fact relied on" the grounds alleged); *Nu-Look Design, Inc. v. Comm'r*, 85 T.C.M. (CCH) 927, 2003 Tax Ct. Memo LEXIS 48, at *21 (2003) ("The statute does not countenance ex post facto justification."). Importantly, this requirement functions as a double-edged sword. While on the one hand, courts must liberally construe potential grounds for reasonable reliance, courts must be extremely vigilant in only applying the tax relief afforded by § 530 when "the taxpayer . . . relied on the alleged authority . . . at the time the employment decisions were being made." *Veterinary Surgical Consultants, P.C. v. Comm'r*, 85 T.C.M. (CCH) 901, 2003 Tax Ct. Memo LEXIS 52, at *24-25 (2003); *see also 303 West 42nd St. Enters.*, 181 F.3d at 277.

In applying the reasonable basis requirement, the Tax Court concluded that reliance on the decisions of the BWC and the OIC could not be considered reasonable. In reaching this conclusion, the Tax Court cited *Nu-Look Design*, for the proposition that "[f]or a taxpayer to have a reasonable basis for not treating an individual as an employee under the judicial precedent safe harbor, the

-20-

judicial precedent relied upon must have evaluated the employment relationship through a Federal common law analysis." And, according to the Tax Court, "[t]he record does not indicate that the BWC [or] the OIC . . . evaluated the employment relationships of petitioner's former drivers, Chatfield and Jamison, through a common law analysis."[2] We disagree with the Tax Court's conclusion.

In doing so, we begin by noting that, although not part of the record before us, the Ohio Board of Worker's Compensation appears to employ a twenty-factor common-law test virtually identical to the twenty-factor test outlined by Internal Revenue Service for determining whether individuals are employees or independent contractors. *Compare* http://www.ohiobwc.com/infostation/content/1/1.2/1.2.8.1.2.2.1.htm (stating that the Ohio BWC uses the twenty-factor test outlined at O.R.C. § 4123.01(A)(1)(c)), *and* O.R.C. § 4123.01(A)(1)(c), *with* Rev. Rul. 87-41; 1987-1 C.B. 296 (outlining the Internal Revenue Service's twenty-factor common law test). Indeed, at oral argument the Commissioner could not point to another jurisdiction in the United States that uses a test for differentiating between employees and independent contractors at odds with typical common-law tests. Thus, much of the Commissioner's argument stands on shaky ground.

But more importantly, *Nu-Look Design* is clearly distinguishable from our own case. In *Nu-Look Design*, the petitioners relied upon the language in previously decided cases, applying the logic of those cases to their own. *Nu-Look Design*, 2003 Tax Ct. Memo LEXIS 48, at *21. In our own

---

[2]The Tax Court also stated that it had no evidence that the Ohio Court of Common Pleas used federal common law analysis. The record does not indicate that there ever was an adjudication of any claims in the Court of Common Pleas, only that Chatfield filed an appeal of his independent contractor designation and then withdrew that appeal on June 18, 1996.

case, Peno Trucking received official determinations – the determinations of the OIC and the BWC – as to the status of its truckers. Peno Trucking did not engage in the type of specious application of prior case law that pervaded the arguments of the petitioner in *Nu-Look Design*. Indeed, Peno Trucking's reliance on the official determinations of the OIC and the BWC would seem to satisfy the reasonable basis requirement.

This is especially the case in circumstances like ours, where the individuals in question, while ultimately determined to be employees, resemble independent contractors on many counts. It is in such cases where courts can be confident that § 530 functions to advance its legislative purpose: "to protect employers who exercised good faith in determining whether their workers were employees or independent contractors." *General Inv. Corp.*, 823 F.2d at 340 (9th Cir. 1987).

With the burden shifted, the Commissioner has not demonstrated that Peno Trucking does not qualify for tax relief under § 530. *See McClellan*, 900 F. Supp. at 107 (" Once the taxpayer has made this *prima facie* showing, the burden then shifts to the IRS to verify or refute the taxpayer's explanation."). The Commissioner has not presented any evidence of Peno Trucking's treatment of the truckers in question in a manner inconsistent with that of an independent contractor and the Commissioner has not presented any tax returns, filed by Peno Trucking, that would be inconsistent with its truckers' independent contractor status. In addition, the Commissioner has not alleged that Peno Trucking has failed to cooperate in any way with the reasonable requests made in the underlying audit.

The Commissioner does argue, however, that Peno Trucking could not have in fact relied upon the decisions of the OIC and the BWC because those determinations came after the decision to treat the truckers in question as independent contractors. This argument overlooks the factual

record here. Although the decisions of the BWC and the OIC in response to Jamison's workers

compensation claim were rendered in late 1997, too late to have actually served as the basis for Peno

Trucking's employment decision, the OIC's decision to treat Chatfield as an independent contractor

was rendered on October 25, 1995. Thus, Peno Trucking could have in fact relied upon the decision

of the OIC in making its employment decision for the years in question – 1997 though 1999 – to treat

its truckers as independent contractors.[3] Indeed, Robert Peno, Sr., testified at trial that this was in

fact what he had done. The Commissioner has not provided any evidence to the contrary. Therefore,

pursuant to § 530, we conclude that Peno Trucking is eligible for relief from the tax liabilities

imposed upon it by the Commissioner.

V.

For the foregoing reasons, we reverse the decision of the Tax Court.

---

[3]The Commissioner, in his brief, seems to argue that the OIC's decision in Chatfield's case could not have been relied upon because Chatfield could still have pursued an appeal of the OIC's decision in the Court of Common Pleas until June 18, 1997. While this may in fact have been the case, the Commissioner fails to explain why the mere fact that Chatfield could have appealed the decision of the OIC until June 18, 1997 should preclude Peno Trucking from relying on the decision of the OIC prior to that point.